William L. SCHNORBACH et al., Plaintiffs,

v.

J. B. FUQUA, Individually, and Fuqua Television, Inc., a corporation, Defendants,

and

Larry Bennett et al., Intervenors.

Civ. A. No. 175–11.

United States District Court, S. D. Georgia, Augusta Division.

Oct. 7, 1975.

426

W. Hale Barrett, Wyckliffe A. Knox, Jr., Randall H. Nunn, Augusta, Ga., for plaintiffs.

Robert J. Ahrenholz, G. Bertrand Hester, Augusta, Ga., for Fuqua Television, Inc.

Michael C. Murphy, Carl E. Sanders, Atlanta, Ga., for J. B. Fuqua.

Roy V. Harris, Stanley G. Jackson, Augusta, Ga., for intervenors.

## MEMORANDUM AND ORDER

ALAIMO, District Judge.

This action was brought by four minority stockholders of Fuqua Television, Inc., against that corporation and J. B. Fuqua, its majority stockholder. Jurisdiction is based on Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa. The complaint is in five counts: Counts I and II against both defendants under Sections 10(b) and 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78n(a); Count III against the individual defendant under Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d); and Counts IV and V against the individual defendant on state law claims of *ultra vires* action by the corporation and breach of common-law fiduciary duty by its majority stockholder. Plaintiffs allege pendent jurisdiction over Counts IV and V, which are stated derivatively. Plaintiffs seek to certify a class composed of all record shareholders of Fuqua Television (except officers and directors) on the date of a certain proxy statement. Defendants and Intervenors oppose any class certification. Alternatively, defendants move for summary judgment on Counts III and IV as failing to state a claim, and for partial summary judgment on Counts I, II, and V as to holders of round lots of shares.

## FACTUAL BACKGROUND

Defendant Fuqua Television, Inc. (hereinafter FTI) is a Georgia corporation which owns and operates WJBF–TV, in Augusta, Georgia, VHF television station. This station was built by a predecessor of FTI in 1953 and has been operated since that time by corporations controlled by defendant, J. B. Fuqua. FTI was organized December 31, 1970, as a wholly-owned subsidiary of Fuqua National, Inc. Fuqua National was merged into the Central Foundry Company on July 1, 1971. The surviving corporation was called Gable Industries. Gable, having become the parent of FTI, distributed all its FTI shares to Gable stockholders on May 31, 1973, as a special stock dividend. One result of this spin-off was the acquisition of FTI stock by the plaintiffs in this case. After the spin-off, defendant Fuqua owned about 24 percent of the outstanding stock of FTI.

Later in 1973, FTI entered into a joint venture with Hytech Energy Corporation to explore for oil and gas, and in 1974 increased its investment in the venture. At some time between these investments, defendant Fuqua became and still is a director and controlling stockholder of Hytech.

Beginning in December, 1973, defendant Fuqua began purchasing large quantities of FTI stock. He contends his purpose was to purchase shares held by foreign owners, because FTI was in danger of exceeding the Federal Communications Commission's limit on foreign control, thereby subjecting itself to loss of its broadcasting license. Plaintiffs contend the purpose was to obtain absolute control of FTI in order to carry out major changes in the corporation. There is no dispute that by May 31, 1974, Mr. Fuqua had moved from 24 per cent ownership of FTI to over 50 per cent ownership.

At some time after the spin-off, FTI's management decided to seek shareholder approval of a Plan of Recapitalization. The Plan was announced in a press release November 25, 1974; the books

were closed December 2, 1974; and a Notice of Special Shareholders' Meeting and Proxy Statement was sent out December 11, 1974. The Plan provided for a reverse split by changing the authorized common stock of FTI from 3,000,000 shares of 10-cent par value to 30,000 shares of $10 par value; required round-lot owners to exchange each lot of 100 10-cent shares for one $10 par value share; and required all fractional shares to be redeemed for $3 per share, unless appraisal was sought.[1] On the record date, there was approximately 2,350 stockholders holding 593,273 common shares. Less than 300 stockholders owned round lots. Thus, the redemption of the 50,773 fractional shares would buy out the interests of about 2,000 shareholders, thereby making FTI eligible to seek deregistration with the Securities Exchange Commission (SEC).[2] On December 20, 1974, counsel for plaintiffs sent objections to the Plan and the special meeting to the defendants. Despite these objections, the Plan was approved by 96 per cent of the shares voted at the shareholders' meeting on December 28, 1974.

The plaintiffs contend that the proxy solicitation material contained various misrepresentations, misleading statements, and omissions, especially concerning the effect of the oil and gas investment on FTI's earnings per share, and Mr. Fuqua's part in the removal of FTI stock quotations from the Augusta newspapers. Plaintiffs allege defendants harmed them and the class they seek to represent (1) by giving the impression to fractional shareholders that there was little market for their shares, so that they would accept the $3 per share offered, when the fair market value of each share was $20; (2) by creating a high price per share for the new shares, thereby decreasing marketability; and

(3) by *ultra vires* actions and breaches of fiduciary duty which depreciated the value of FTI stock.

Defendants respond by denying the harms alleged, and by strongly challenging the certification of the proposed class, arguing particularly that conflicts *inter sese* exist which make class status inappropriate. Defendants point to the conflict between primary and derivative recovery, and the conflict between fractional and round-lot shareholders: *i. e.,* damages to the former would dilute the equity interests of the latter.

Seventeen employee-shareholders of FTI, who have been allowed to intervene, urge the denial of class certification. They fear that a successful class action may endanger the solvency of FTI as well as their jobs.

The Court will take up, first, the facts, issues, and arguments relating to the motion for class certification, particularly within the context of the case law developed under Rule 23, Fed.R.Civ.P. and then dispose of the questions raised by the various motions for summary judgment.

## THE MOTION FOR CLASS CERTIFICATION

I. *A Prerequisite of Rule 23(a). Adequate Representation.*

■ Fed.R.Civ.P. 23(a) lists four prerequisites to the maintenance of a class action. The first, numerosity, is clearly met here where the proposed class numbers approximately 2,350. *See* 3B J. Moore, *Federal Practice* ¶ 23.05 (1974) (hereinafter J. Moore).

■ The second prerequisite, the existence of common questions of law or fact, seems somewhat redundant in light of Rule 23(b)(3)'s requirement of the predominance of common over individual

1. *See generally Georgia Code Ann.* § 22–1202 for rights of dissenting stockholders to redemption and appraisal.

2. *See* 15 U.S.C.A. § 78*l*(g)(4) which provides in part: "Registration of any class of security pursuant to this subsection shall be terminated ninety days, or such shorter period as the Commission may determine, after the insurer files a certification with the Commission that the number of holders of record of such class of security is reduced to less than three hundred persons."

questions. See 3B J. Moore ¶ 23.06–1 at 23–301. Certainly the existence and materiality of defendant's alleged misrepresentations and omissions made to the proposed class present common questions. *See, e. g., Korn v. Franchard Corporation,* 456 F.2d 1206, 1210 (2d Cir. 1972).

■ The third prerequisite, typicality, seems both repetitive of more specific requirements of Rule 23 and unclear in meaning. Courts have equated typicality with both Rule 23(a)(2)'s commonality and Rule 23(a)(4)'s adequate representation. *See* 3B J. Moore ¶ 23.06–2 at 23–325. In the securities area, the typicality prerequisite has been held met even where the representative party's recovery might be barred by defenses unique to him. *Mersay v. First Republic Corporation,* 43 F.R.D. 465, 468 (S.D.N.Y.1968). In *Mersay,* the plaintiff was an insider with much more knowledge than the average shareholder. His individual claim was vulnerable to unique defenses available only against him. Nevertheless, since his claim was based on written misrepresentations made to the class, it was typical. Applied to the instant facts, if the knowledge of an insider is insufficiently atypical, then *a fortiori* the plaintiffs, whose special knowledge consisted of suspicions of misrepresentations, cannot be said to be atypical. The discovery of misrepresentations by the named plaintiffs was held not to bar class recovery in *Kohn v. American Metal Climax, Inc.,* 458 F.2d 255, 269 (3d Cir.), *cert. denied,* 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972). Finally, the proposed class consists of both round-lot shareholders and fractional shareholders, thereby insuring typicality of the claims of each group.

The final prerequisite of Rule 23(a), adequate representation, presents a more difficult question. As a general background, the case of *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940), established as a matter of due process that a court cannot simply assume that any member of a purported class sharing a common legal right would be an adequate representative. Although no clear constitutional standard was enunciated, it is clear that a court must examine the facts and circumstances of each case to determine the actual interests of class members. *Hansberry* emphasizes the basic issue of adequate representation: whether there are significant antagonistic interests between the representative and the class. *See generally* 3B J. Moore ¶ 23.07[3]; C. Wright and A. Miller, *Federal Practice* § 1768 (1972).

### A. Primary versus Derivative Claims.

■ Defendants contend that two types of conflicts of interest exist. First, they argue that for plaintiffs to make both primary and derivative claims against a corporation presents a conflict between equity and non-equity interests. That is, whatever is recovered from the corporation as class damages for fractional shareholders (now ex-shareholders) would come directly from corporate funds, and indirectly from the current shareholders' pockets.

Several courts have considered this situation. In *Ruggiero v. American Bioculture, Inc.,* 56 F.R.D. 93 (S.D.N.Y.1972), at issue was the consolidation of a derivative and a class action against the same corporate defendant. There were separate plaintiffs with separate counsel. The court allowed consolidation, but refused to make the attorneys in the derivative action leading counsel in the class action as well. The reasons given were the conflict between recovery "for" and "against" the corporation, and the "substantial" equity interests of the derivative plaintiffs which might outweigh their personal interests in the recovery of damages. Thus, separate counsel and plaintiffs were retained for the consolidated class and derivative action.

Similarly, in *Hawk Industries, Inc. v. Bausch & Lomb, Inc.,* 59 F.R.D. 619 (S.D. N.Y.1973), the court ruled that counsel could not simultaneously prosecute a federal class action against Bausch and Lomb and a state derivative action on behalf of Bausch and Lomb. Instead,

co-counsel in the federal case were allowed to represent the class.

In the corporate reorganization setting, two cases in the Fifth Circuit deserve mention. In *Carpenter v. Hall,* 311 F.Supp. 1099 (S.D.Tex.1970), *mandamus granted in part, sub nom. Ernst and Ernst v. United States District Court for the Southern District of Texas,* 457 F.2d 1399 (5th Cir. 1972), a reorganization trustee sought to represent both the corporation and a class of defrauded stockholders, alleging that both had fallen prey to the same manipulative scheme violative of Rule 10b–5. Under the Reorganization Plan, any liability of the corporation to the stockholders was to be settled, to avoid conflicts of interest. This satisfied the District Court, but on review the Fifth Circuit ordered the lower court to appoint an additional class representative to appear as plaintiff with the Trustee—a representative not subject to defendant's objections to the Trustee. Unfortunately, neither the *per curiam* opinion of the Court of Appeals nor the lengthy opinion of the District Court spells out what these objections were. The import of *Carpenter* is therefore cloudy. With the addition of a separate shareholder representative, the action was allowed for the corporation and the shareholders, despite possible liability of the former to the latter. A district court subsequent to *Carpenter* has held that a reorganization trustee may not be an adequate representative of a class of defrauded stockholders. *King v. Sharp,* 63 F.R.D. 60 (N.D.Tex.1974). The force of this holding must be tempered by the fact that the decision was apparently grounded on a lack of. *standing* in the trustee, since the corporation was never a "purchaser" and therefore was not a member of the class. *See id.* at 63–64.

Thus, there is little relevant authority in the Fifth Circuit on the question, since the existing cases are both unclear and not precisely in point. *Ruggiero* and *Hawk,* then, are the major cases against the maintenance of a combined class and derivative action. In response, plaintiffs attempt to skirt the issue by arguing that their prayer for a personal judgment on the derivative claims removes any conflict by placing all monies in the pockets of the minority stockholders. *See* Plaintiffs' Supplemental Memorandum of May 27, 1975, at 9. This argument, of course, depends on the availability of a personal judgment on a derivative claim under the appropriate state substantive law. Professor Moore states that the rule of recovery for the corporation is well-settled, see 3B J. Moore ¶ 23.-1.17 at 23.1–156, and that recovery "normally" goes to the corporation. *See id.* ¶ 23.1.15[2] at 23.1–64. This is indeed the Georgia rule. *See Georgia Code Ann.* § 22–615(d) (plaintiffs in derivative action recover expenses, remainder to corporation); *Pickett v. Paine,* 230 Ga. 786, 790–92, 199 S.E.2d 223 (1973) (minority shareholder cannot directly share in recovery, which is for corporation). Thus plaintiffs' argument seems fatally flawed on this point.

Plaintiffs also attempt to distinguish *Ruggiero* by arguing they represent only equity interests. This is also unconvincing, since plaintiffs admit that by operation of law, all fractional shareholders lost their shareholder status after December 28, 1974. *See* Answers to Interrogatories of William L. Schnorbach, FTI 56, 57(e) at 23–24 (May 28, 1975). Thus, the class plaintiffs seek to represent includes both equity and non-equity interests, since the old fractional shareholders no longer hold shares in the recapitalized corporation.

Plaintiffs cite *Heilbrunn v. Hanover Equities Corp.,* 259 F.Supp. 936 (S.D.N.Y. 1966) and *Miller v. Fisco, Inc.,* 63 F.R.D. 132 (E.D.Pa.1974) for the proposition that the conflict between primary and derivative actions is only apparent. *Heilbrunn* holds that in reality the plaintiffs are antagonistic to management, not to the corporation itself. 259 F.Supp. at 939. *Miller* states that a recovery for the corporation and for the shareholders personally is theoretically for the same interests. 63 F.R.D. at 134. However, neither of these cases dealt with the question of class certification.

Rather, motions to dismiss the derivative claim were before the courts. *Miller* holds that "additional considerations," especially adequate representation, which would be present in class certification are *not* present on a motion to dismiss. 63 F.R.D. at 134.

Thus, the reasoning of *Ruggiero, supra,* and *Hawk, supra,* stands as applicable to the instant facts. Further, the Fifth Circuit in *Carpenter, supra,* requires the careful examination of the adequacy of representation in situations such as this. The conflict between primary and derivative recovery is a factor to be weighed in the decision on class certification in this case.

B. *Fractional versus Round Lot Shareholders.*

The other major conflict asserted by defendants is between shareholders with varying amounts of stock. Under the Recapitalization Plan, the corporation offered to redeem all fractional shares at $3 per share; each round lot of 100 ten-cent shares would be converted to one new share of $10 par value. The result was the buying out of approximately 2,050 fractional shareholders, leaving less than 300 holders of the new $10 par value stock. Thus, the proposed class consists of both equity and non-equity interests, and defendants urge that the recovery sought would benefit the non-equity interests at the expense of the equity interests; that is, the very large recovery sought by plaintiffs (well over two million dollars) would harm the equity interests of present stockholders for the benefit of past stockholders. Further, defendants argue that if indeed the $3 per share paid to the fractional shareholders was too low, the round lot shareholders were benefited thereby. That is, the round lot owners received a 9 per cent increase in their equity interest at a price that was, according to plaintiffs, unfair to the fractional holders—but all the more advantageous to the round lot owners, according to defendants. In response, plaintiffs amended the prayer for relief. The prayer originally sought damages based on the price paid to frac-tional shareholders, and damages based on lost marketability for the round lot shareholders. As amended, "rescission-al" damages based on the fair value of the shares are sought alternatively for round lot holders. Although this makes both round and fractional owners seek a similar *measure of damages* (at least in the alternative), it does nothing to remove the conflict in their *interests.* The fact remains that the round lot holders would be benefited by the allegedly unfair price paid to fractional owners. Further, the basic interests of round lot owners might well differ from fractional owners, since the former received an increased equity ownership as a result of recapitalization, an equity interest not shared by the fractional owners.

Defendants also argue that conflicts exist based on the proportion of fractional to round lot shares. For example, a holder of 101 shares before the Plan would not wish the corporation to pay damages to a holder of 199 shares, since the former would be more interested in protecting his equity interest.

Thus, defendants contend that there are at least three subgroups having diverse conflicting interests within the proposed class: fractional shareholders, who received the right to cash only; round lot owners, who received new shares only; and shareholders with both fractional and round lots (*e.g.,* 199 shares) who received both new shares and the right to cash. Because of the differing treatment of these three groups in the recapitalization, and their different positions today, defendants argue that certification of the proposed class would be inappropriate.

An examination of the case law on the issue of the representation of both past and present shareholders produces no clear result. On the one hand, only two cases have directly held against representation of both past and present shareholders. In *Weisfeld v. Spartans Industries, Inc.,* 58 F.R.D. 570 (S.D.N.Y.1972), a proxy solicitation was followed by a merger. A dissatisfied stockholder, alleging misrepresentation, brought a

Section 10(b) action to enjoin or rescind the merger, or for damages, plus a derivative action seeking the same relief for the corporation. The court held that he could not represent those who had purchased stock *after* the proxy statement, for lack of typicality; that he could not represent those who no longer held their original stock, since they presumably would not desire his rescissory remedy; and that he could not represent preferred shareholders, who had lost a dividend right in the merger. The latter two situations display a conflict over *remedies* between the plaintiff, who primarily wanted rescission, and those in the proposed class who would not want rescission. (Those who had exchanged their old shares or had had them appraised and sold could not benefit from rescission and reconstitution of the premerger corporation.) The court narrowed the class to common stockholders of record on the proxy statement date who had retained their shares. *Weisfeld* thus suggests narrowing of the class to avoid conflicts.

The other case on this point is *Wood v. Rex-Noreco*, 61 F.R.D. 669 (S.D.N.Y. 1973), where class certification was denied because of a conflict between those who had sold their stock and realized losses, and those who had retained their stock. Although the court's reasons were not stated, the court in *Umbriac v. American Snacks, Inc.*, 388 F.Supp. 265 (E.D.Pa.1975), explained that *Wood's* rationale was based on the rule in the Second Circuit expressed in *Mutual Shares Corporation v. Genesco, Inc.*, 384 F.2d 540, 546 (2d Cir. 1967), that non-selling shareholders had no right to damages under Section 10(b). Therefore, non-sellers could not represent sellers, who *could* obtain damages. *See Puharich v. Borders Electronics Co.*, 11 Fed. Rules Serv.2d 23a.52, case 5 (S.D.N.Y. 1968). In both these cases, non-selling plaintiffs had no interest in the potential damage claims of selling shareholders. *Wood's* citation of these two cases, *see* 61 F.R.D. at 672, supports the *Umbriac* court's reading. *Wood* is, therefore, distinguishable from the instant situation, where plaintiffs have interests in damages coextensive with those of the proposed class, apart from individual differences in amount.

A related case from the antitrust area, *Free World Foreign Cars, Inc. v. Alfa Romeo, S.P.A.*, 55 F.R.D. 26 (S.D.N.Y. 1972) denied class certification when a former franchisee of defendant sought to represent current franchisees who "presently depend upon the economic viability of the defendant." 55 F.R.D. at 29. Since plaintiff was no longer so dependent, he could not represent those who were. These facts are distinguishable as to most of the proposed class since the situation of small shareholders is hardly analogous to that of franchisees whose businesses depend on their distributor. However, the Intervenors, employee-shareholders of defendant FTI, argue for the application of *Free World Foreign Cars, supra*, implying that their dependence on their jobs is analogous to that of the franchisees. That is, a large verdict could cripple FTI and endanger the Intervenors' employment. Coming from members of the proposed class, these arguments must be considered in the decision on certification. (This matter will be more fully considered in Section E, *infra*.) Thus, there is little categorical opposition to the certification of classes consisting of both past and present shareholders. On the other hand, many of the cases in which certification was granted are factually distinguishable. For example in *Herbst v. Able*, 47 F.R.D. 11 (S.D.N.Y.1969), the proposed class included all those who had converted their debentures into common stock in a certain period. Even though one plaintiff had sold at a loss, another had retained his common, and another had sold part and retained part, the court certified the class, reasoning that every defrauded stockholder "wears two hats," 47 F.R.D. at 15, but his personal interest in damages outweighs his equity interest, unless he had large holdings, in which case he can opt out. The court was convinced that "a plaintiff who has acquired and *retained* securities of Douglas can 'fairly and adequately' represent those who

purchased securities and thereafter sold them—and vice versa." 47 F.R.D. at 15.

A similar result obtained in *Feder v. Harrington*, 52 F.R.D. 178 (S.D.N.Y. 1970), where one plaintiff who had sold her small holdings was allowed to represent both past and present stockholders. Objections by current stockholders should be handled by subclasses or the opting-out provision, stated the court, since "class members in nearly every securities action have this 'conflict of interests'," 52 F.R.D. at 182, and to deny certification would be to deter class actions in appropriate circumstances.

*Herbst v. International Telephone & Telegraph Corp.*, 495 F.2d 1308 (2d Cir. 1974) involved a similar effort by a plaintiff, who had sold her small holdings, to represent a class including those who had not sold. The alleged misrepresentations concerned I.T.T.'s acquisition of the Hartford Fire Insurance Company. Plaintiff and the class had exchanged their Hartford shares for I.T.T. shares. The court reasoned that the present shareholders' interest in damages far outweighed their fear of harm to giant I.T.T., and certified the class. To the extent that this decision depends on the lack of danger to the corporate defendant, it is distinguishable. In the instant case, where the potential effect on the corporate defendant is much greater, the conflict between past and present shareholders is likewise much greater. In *Kahan v. Rosenstiel*, 424 F.2d 161 (3d Cir.), *cert. denied*, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970), the Court in a converse situation, allowed a plaintiff who had retained stock to represent a class including those who had sold, where the same alleged misrepresentations had been made to all.

In *Madonick v. Denison Mines, Ltd.*, 63 F.R.D. 657 (S.D.N.Y.1974), the court held that the alleged conflict between past and present stockholders was not genuine antagonism. However, the court cited *Ruggiero, supra*, with approval as an example of true conflict, see 63 F.R.D. at 659, so that the *Madonick* court apparently would follow *Ruggiero* in the

present case and deny certification of the class as proposed.

In *Umbriac v. American Snacks, Inc.*, 388 F.Supp. 265 (E.D.Pa.1975), the court certified a class consisting of both past and present debenture holders, since both groups sought money damages one for their realized loss, the other for the devaluation of their holdings. Named plaintiffs included members of both groups. However, this case is distinguishable because of the very different positions of debenture holders and equity shareholders. The effect of a recovery on present debenture holders would be much more attenuated than the effect on present shareholders, whose equity interests would be directly affected.

Finally, in *Handwerger v. Ginsberg*, [1974–75 Transfer Binder] CCH Fed.Sec. L.Rep. ¶ 94,934 (S.D.N.Y.1975), plaintiff sued on behalf of purchasers of both debentures and common stock, including both past and present holders. Certification was granted, the rationale being that the conflict between past and present holders was only genuine if present holders had "substantial" equity interests. *Id.* at 97,240 n. 10. Plaintiff's $5,000 worth of debentures, of an $8,200,000 total, was insignificant. *Id.* at 97,241.

Thus, several courts have concluded that absent a "substantial" equity interest in the representative party, and absent a conflict over alternative remedies, the "conflict" between past and present shareholders is no bar to certification. In the case at bar, the largest holdings of a plaintiff were 2,020 of the old shares out of about 594,000, or 20 new shares of about 5,900. This is less than one-half of one per cent; its current market value is claimed by plaintiffs to be about $2,000 ($100 per share). Alternatively, at the repurchase price of $3 per share, the value would be $6,000, substantially less than plaintiff's claimed damages of over $40,000.

Therefore, the size of plaintiffs' holdings is not a factor. However, none of the cases in which certification was granted contains all the significant fac-

·tual features of the present case. None of them, for example, involves an intervention by disgruntled potential class members, or an increase in equity ownership in part of the proposed class based on an allegedly unfair price paid to another part. Thus, the various courts that granted certification to classes consisting of past and present shareholders did so on a *prima facie* lack of apparent conflicts of interest within the class. But a court faced with such conflicts cannot simply close its eyes to them and grant certification. These conflicts must be dealt with, either by restructuring the class or by denial of certification. The factual situation here differs significantly from the situations in the cases in which certification was granted. This Court concludes that there is no clear case law on the unique conflicts in the case under consideration.

### C. *Conflicts over Remedies.*

Another type of antagonism which has more frequently led to the denial of certification is a conflict over alternative remedies, particularly where a plaintiff primarily seeks rescission while many in the class desire only damages. *See Weisfeld v. Spartans Industries, Inc.,* 58 F.R.D. 570 (S.D.N.Y.1972); *Guttmann v. Braemer,* 51 F.R.D. 537 (S.D.N.Y.1970); *Maynard, Merel & Co. v. Carcioppolo,* 51 F.R.D. 273 (S.D.N.Y.1970). All three of these cases concerned a proxy solicitation followed by a merger, after which many shareholders either exchanged their old shares for new ones and sold, or exercised appraisal rights on their old shares. Such stockholders could not benefit from rescission. But plaintiffs in all three cases were mainly seeking rescission, because of personal interests they did not share with the classes. In both *Maynard* and *Guttmann* certification was denied, the *Guttmann* court stating that "[o]rdinarily the existence of differences in position, or even the possibility of certain antagonisms between class members, should not preclude" certification, 51 F.R.D. at 538; but where plaintiff seeks an "entirely different type of relief" from that presumably desired by many

in the proposed class, certification was inappropriate. *Id.* at 539. The court had suggested narrowing the class to the 604 retainers of the old stock. Instead, plaintiff offered to drop his request for rescission. This effort to "barter away" the rights of those in plaintiff's own situation in order to obtain damages and attorney's fees led the court to deny certification outrightly.

In *Weisfeld,* absent such conduct, the court did certify a class limited to current holders of old shares. Applied to the present facts, *Weisfeld* would support certification of a class suitably narrowed to eliminate conflicts. Of course, the instant case contains no conflict over alternative remedies; rather, the question is whether the class desires the only remedy (damages) sought by plaintiffs. The Intervenors contend that the class, or at least some in the class, do not wish to see any damages assessed against the corporation. This contention will be treated in a separate section on the Intervenors. *See* Section E, *infra.*

A remedies conflict from outside the securities area is found in *Phillips v. Klassen,* 163 U.S.App.D.C. 360, 502 F.2d 362 (1974), *cert. denied,* 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1975). Certain U.S. Postal employees who had retired early sued on behalf of all early retirees. Since only some in the proposed class had suffered economic injury, and since only some would want (or be able to) utilize) the reinstatement remedy sought by plaintiffs, the interests present were too divergent for a class action. This reasoning has some force in the present case, where there is conflict over the desirability of the remedy sought and where the members of the proposed class are in differing economic positions. In conclusion, the conflicts-over-remedies cases are not strictly applicable, but their reasoning supports the need to structure the class to avoid apparent conflicts.

### D. *Economic Antagonism.*

Another type of antagonism requiring denial of certification is clear economic antagonism between representative and

class. For example, in *United Egg Producers v. Bauer International Corp.,* 312 F.Supp. 319 (S.D.N.Y.1970), an antitrust action, a large supplier of eggs could not represent consumers of eggs. In *Sanders v. John Nuveen & Co.,* 463 F.2d 1075 (7th Cir. 1972), an insolvent debtor obligated on several classes of debt was sued in a securities class action by holders of short-term obligations. The court of appeals held it was error to allow intervention by two banks holding long-term obligations, since their interests were *"per se* antagonistic" to plaintiffs. Any advantage to the intervenors would be at the expense of plaintiffs, and vice versa. *See* 463 F.2d at 1081.

In *du Pont v. Wyly,* 61 F.R.D. 615 (D.Del.1973), plaintiff was involved in a wide-ranging legal battle with defendant, of which the securities action before the court was a relatively minor part. Plaintiff stood to receive much more from his antitrust action ($150 million) than from his share of a class securities recovery. Thus, he had an economic conflict with the class, since he might "throw" the class action to recover more in the antitrust action (Defendant's net worth was about one-half the damages sought in the antitrust action. *See* 61 F.R.D. at 621.)

*Carroll v. American Federation of Musicians,* 372 F.2d 155 (2d Cir. 1967), *rev'd on other grounds,* 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968), was a class antitrust action brought by orchestra leaders. "Many" in the proposed class supported the union and were dependent on the practices attacked in the suit. *See* 372 F.2d at 162. Therefore, adequate representation was lacking to bind absent class members.

None of the clear economic antagonisms present in these cases is present in the instant case. Rather, its facts are closer to those in the cases involving representation of past and present shareholders, discussed *supra.*

E. *Opposition to Certification by Intervenors.*

*Carroll, supra,* does suggest the interesting question of the effect of opposition to the class action by class members based on economic self-interest. If the Intervenors here could be substituted for the absent pro-union class members in *Carroll,* that opinion would support denial of certification.

Case law on this point is scant. In *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940), 54 per cent of the landowners in an area had signed a racially restrictive covenant which was by its terms effective only if 95 per cent signed. However, in a prior suit some of the landowners had falsely stipulated that 95 per cent had signed, and the state Supreme Court had held all landowners bound by *res judicata.* Hansberry, a black landowner in the area, and others sought to challenge the agreement. The Supreme Court held that the prior suit was *not* binding on absent landowners, since a clear conflict existed over whether the agreement should be enforced or not. The Court was not concerned with the number of objectors, finding the existence of this basic conflict sufficient. Applied literally, *Hansberry* would prohibit the binding of absent members whenever any class member later expressed opposition to the position taken in prior litigation. However, *Hansberry* concerned the effect of a state court judgment on a class—not the certification of a class under the Federal Rules. *Hansberry* provides only general guidance for determining adequacy of representation.

Later cases have employed more concrete reasoning. In *Schy v. Susquehanna Corp.,* 419 F.2d 1112 (7th Cir.), *cert. denied,* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970), after being informed of the suit, 80 per cent of the proposed class voted for the proposal complained of by plaintiff. The latter was not allowed to represent the class. In *du Pont v. Perot,* 59 F.R.D. 404, 412 (S.D.N.Y. 1973), the court found "overwhelming" conflicts between plaintiff and the proposed class where 90 percent of the proposed class had already chosen a method of compensation in the transaction complained of, a method which included their release from liability. Plaintiff's

action would unravel this complicated pattern. Further, six suits had been filed against plaintiff by class members, making the same charge levelled by defendants in the case at bar. *Id.* at 411.

The instant facts do not show the clear and overwhelming expressions of opposition present in *Schy* and *du Pont.* So far, only 17 stockholders of approximately 2,350 have intervened against, or otherwise opposed certification. At issue is the effect to be given the expression of opposition by a small fraction of the proposed class. If the opposition advanced by the Intervenors is characteristic of significant portions of the class, certification of a class including those opponents would be improper. If the Intervenors represent only a small number in the class, the proper resolution would be their opting out. The Intervenors fear that this action, if successful, could ruin their employer, which would harm their interests both as employees and present shareholders. Since the recovery sought roughly equals FTI's net worth, this fear is not groundless. But Intervenors' interest as employees, although real, is not characteristic of the proposed class, since only a relative handful of the shareholders are also employees. Their interest as shareholders, however, may be characteristic of round lot owners in the proposed class who presently hold FTI shares. Thus, although the opposition expressed here is insufficient to require a denial of certification, altogether, it is another factor to be weighed in the proper disposition of this question.

### F. *Lack of Diligence and Qualifications of Counsel.*

Defendants argue that plaintiffs' prior acts—or failures to act—show their unfitness as class representatives. Defendants point out that plaintiffs' only action before the special shareholder meeting on the Recapitalization Plan was the writing of a letter of protest by their attorney. Plaintiffs made *no effort to con-*tact other stockholders or to obtain a temporary restraining order against the meeting. But as plaintiffs point out, they had insufficient knowledge to justify contacting other shareholders, and in the broader sense, theirs is the election of remedies. The question is whether the court is convinced plaintiffs will vigorously prosecute *this action* on behalf of the class. There is nothing to indicate otherwise.

Defendants' final argument on the issue of adequate representation is that plaintiffs' counsel are not qualified. This argument is refuted by counsel's past experience, *see* Plaintiffs' Memorandum at 13–14 (May 27, 1975), as well as by their conduct of the present litigation.

### G. *Summary and Conclusions.*

This Court has made a careful examination of relevant case authority on the question of the adequacy of representation on the facts of this case. Several factors lead to the conclusion that both certification of the class as proposed, because of *prima facie* conflicts and antagonisms among class members, as well as denial of certification altogether would be undesirable and perhaps improper. Therefore, the proposed class will be narrowed to include fractional shareholders only—that is, those who held less than 100 shares on December 11, 1974.[3] This resolves the existing conflicts in the following ways. The primary-derivative conflict is removed, since the class would not contain both past and present shareholders. The danger in *Ruggiero, supra,* of a conflict between those with and those without present equity interests would no longer exist. Any recovery against the individual defendant on the derivative claims would go to the corporation and help it in meeting any recovery won by the class on the federal claims. Similarly, the various conflicts among fractional (past), round-lot (present), and mixed shareholders *inter*

---

**3.** The propriety of such class designation is implicitly conceded by defendants. *See* Reply Memorandum of FTI in Opposition to Have Action Declared a Class Action, filed May 16, 1975, at page 15.

*sese* would be dispelled. There would be no discernible conflicts of interest among members of a class consisting only of fractional shareholders, and similarly, no conflicts over the propriety of suit or remedies. The Intervenors, as round lot and mixed holders, would not be in the class, eliminating this basis for defendants' objections. Thus, this Court concludes that based on the facts in this case, and the case law under Rule 23(a), a class consisting of fractional shareholders as of December 11, 1974, as represented by plaintiffs, John R. Schnorbach and Susan S. Hildebran, would meet the requirements of adequacy of representation of Fed.R.Civ.P. 23(a). Plaintiffs, William L. Schnorbach and J. D. Gwinn, may pursue their claims as individuals, in joinder with the class claims. *See* 3B J. Moore, *Federal Practice* ¶ 23.04 at 23–256 (1974).

## II. *The Requirements of Rule 23(b)(3).*

### A. *Predominance of Common Questions.*

Professor Moore states that "[t]he fundamental question is whether the group aspiring to class status is seeking to remedy a common legal grievance." 3B J. Moore, ¶ 23.45[2] at 23–756. In securities-fraud cases, where defendant's activities were standardized (*e. g.*, non-disclosure) or defendant made uniform misrepresentations, courts have held proof of individual reliance and damages a severable issue. *Id.* at 23–762–63. Professor Moore concludes that the individual reliance issue has not defeated class certification in most securities fraud cases, since this question is usually either separable or irrelevant. *Id.* at 23–763–64. The reliance requirement has been greatly eroded through case development. In *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), the Court held that in an action under Section 14(a) of the Securities Exchange Act of 1934, given proof that the misrepresentations or omissions were "material" in an objective sense (for the average shareholder), no actual effect need be shown. *Kohn v. American Metal Cli-*

*max, Inc.*, 458 F.2d 255 (3d Cir. 1972) applied the *Miller* "materiality test" to Section 10(b) cases. And *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) held that in Section 10(b) cases primarily concerned with non-disclosure, positive proof of reliance was not necessary; plaintiff must show "that the facts withheld . . . [were] material in the sense that a reasonable investor might have considered them important . . . ." 406 U.S. at 153–54, 92 S.Ct. at 1472, 31 L.Ed.2d at 761. The remaining area of operation of the reliance requirement is in cases, in the Advisory Committee's words, of "material variation" in the misrepresentations or in the kinds or degrees of reliance. Advisory Committee's Note to Rule 23, 39 F.R.D. 98, 103 (1966). In practice, this ordinarily means oral misrepresentations. Defendant cites *Simon v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 482 F.2d 880, *reh. denied*, 485 F.2d 687 (5th Cir. 1973) for the proposition that general reliance is still required in the Fifth Circuit. In *Simon*, the court affirmed the denial of certification based upon non-predominance of common questions. Since plaintiff had mainly relied on oral misrepresentations which were unique to him, and failed "to prove any standardized representations" by defendant, common questions did not predominate. *See* 482 F.2d at 882–83. This objection does not apply to the present case, where all misrepresentations complained of were written and standardized. *On the merits*, the *Simon* court went on to hold that plaintiffs in Rule 10b–5 actions must show some general reliance on alleged misrepresentations. To harmonize this position with that of the Supreme Court in the *Ute* case, *supra*, the Fifth Circuit in *Vohs v. Dickson*, 495 F.2d 607 (5th Cir. 1974), explained that *Ute* meant that proof of specific reliance was not necessary so long as *general* reliance was shown. 495 F.2d at 622. In *Simon*, plaintiff had failed to convince the court that he had even generally relied, because of his special knowledge. *Simon* also reaffirmed the statement in *Clem-*

ent *A. Evans & Co. v. McAlpine*, 434 F.2d 100 (5th Cir. 1970) that a plaintiff's "sophistication, expertise and business acumen" and his opportunity to detect the fraud are relevant to the question of the reasonableness of his reliance. *Id.* at 104.

*Simon* does not bar certification of the proposed class, since the instant action is based on standardized written, rather than oral, misrepresentations (as well as omissions). *See Livesay v. Punta Gorda Isles, Inc.*, 379 F.Supp. 386 (E.D.Mo. 1974); *Seiffer v. Topsy's International, Inc.*, 64 F.R.D. 714 (D.Kan.1974); *Sirota v. Econo-Car International, Inc.*, 61 F.R.D. 604 (S.D.N.Y.1974). The additional language in *Simon* on the question of reasonable reliance applies to the merits. Assuming *arguendo* that some of the plaintiffs are subject to a defense based on the reliance issue, class certification is still proper. In *Mersay v. First Republic Corporation*, 43 F.R.D. 465 (S.D. N.Y.1968), the Court stated that the representative's "status as an insider may defeat his individual claim," just as other claimants may be subject to various defenses. *Id.* at 468. Nevertheless, representation was proper; and "proof of reliance has usually been considered an individual question" proved separately after the determination of common questions. *Id.* at 471.

■ Similarly, defendants' argument that the issue of damages makes individual questions predominate is without merit. In the recent case of *Shumate & Company v. National Association of Securities Dealers, Inc.*, 509 F.2d 147 (5th Cir. 1975), the Fifth Circuit sharply distinguished between private antitrust actions, where liability depends on proof of individual injuries, and cases "where liability can be shown as to all class members, with only the amount of damage[s] to be determined as to each." *Id.* at 155. The question of individual damages does not generally bar class actions in securities fraud cases. *See* 3B J. Moore ¶ 23.-45[2] at 23–762–63.

Finally, defendants' argument that the proof of causation would make individual questions predominate is no more convincing that the argument as to reliance, since the question of individual causation is but another way of stating reliance.

### B. *Superiority of Method.*

■ Professor Moore suggests that the superiority of the class method in each case depends on (1) whether it would be worthwhile to devote the time required to work out methods to deal with all claims in one action, and (2) whether it would be just to do so. *See* 3B J. Moore, ¶ 23.45[3] at 23–801–02. The class action serves as a vital part of the enforcement of the securities laws. Indeed, it has been stated that the "ultimate effectiveness" of federal remedies when defendants are not prone to settle may depend on private class actions. *See Green v. Wolf Corp.*, 406 F.2d 291, 295 (2d Cir. 1968), *quoting* 3 L. Loss, *Securities Regulation* 1819 (2d ed. 1961). This reasoning, however, does not determine that a class action is always the superior method in a securities fraud case. The *Green* court focused on the fact that about 2,200 purchasers may have been harmed, none of whom seriously enough to motivate an individual action. *See* 406 F.2d at 301. Similarly, in *Korn v. Franchard Corp.*, 456 F.2d 1206, 1214 (2d Cir. 1972), the class action was said to be the *only* available method. Plaintiff's individual claim of $386, *see Korn v. Franchard Corporation*, 443 F.2d 1301, at 1306 (2d Cir. 1971) (earlier proceedings), was too small to prosecute individually, and no other suits were pending. The instant action, by contrast, contains two substantial individual claims ($41,265 and $24,252). *See* Answers to Interrogatories FTI–58, of W. L. Schnorbach (May 28, 1975) at 24 and J. D. Gwinn (June 3, 1975) at 19. It probably could go on as an individual action to enforce the securities laws. On the other hand, this would leave the claims of most in the proposed class unmet, since over 2,000 of them were fractional shareholders whose damages would in no event exceed $2,000 and in many cases would be far less. Of course, the existence of large individual

claims coupled with a finding of no substantial possibility of success on the merits has been the basis of the denial of certification. *See Dolgow v. Anderson*, 53 F.R.D. 664, 669 (E.D.N.Y.1971), aff'd, 464 F.2d 437 (2d Cir. 1972) (individual claim of $14,076).

There are other factors to consider in the determination of the superior method, chief among them being the expected difficulties in management. *See* Fed.R. Civ.P. 23(b)(3)(D). These problems, of course, increase with the size of the class. Some courts have looked upon a class of over 2,000 as an especially appropriate size for class determination, *see Green v. Wolf Corp., supra*, at 301, and the problems of managing a class of this size do not seem great enough to outweigh the benefits of providing an opportunity for a class, most of whom have claims too small to merit individual prosecution, to have its day in court.

### THE MOTIONS FOR PARTIAL SUMMARY JUDGMENT

Defendants have moved for partial summary judgment in the alternative if class certification is granted. Their motion does not challenge the prosecution of Counts I, II, and V by fractional shareholders, but it does challenge all claims by round-lot and mixed shareholders. Further, the motion challenges Counts III and IV as failing to state a claim as to any plaintiff. Thus, based on the limitation of the class to fractional shareholders, the motion for partial summary judgment is applicable to all plaintiffs and the class as to Counts III and IV, and is applicable to individual plaintiffs, W. L. Schnorbach and J. D. Gwinn as to Counts I, II, and V.

#### I. *The Section 10(b) Claim: Standing (Count I).*

■ Defendants contend that the only "purchase or sale" which occurred as a result of the Plan of Recapitalization concerned the 50,773 fractional shares which were repurchased by FTI. Thus, while conceding that holders of fractional shares were "sellers," defendants urge

that round lot holders who merely exchanged their ten-cent shares for $10 shares lack standing as "purchasers" or "sellers" to sue under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). It is clear that claims by plaintiffs who are not "purchasers" or "sellers" are subject to dismissal by a motion for summary judgment. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539, 552, 43 U.S.L.W. 4707, 4713 (1975). Thus, the first question before this Court is whether round lot shareholders have standing to sue under Section 10(b).

■ Plaintiffs cite several merger cases for their contention that the round lot holders here should be deemed "purchasers" or "sellers." As plaintiffs suggest, these cases hold that a shareholder in a corporation which is merged into a new entity, who must accept either shares in the new corporation or cash for his holdings, has standing under Section 10(b). *See SEC v. National Securities, Inc.*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969) (shareholders of merged company became shareholders in new company and lost appraisal rights); *Vine v. Beneficial Finance Co.*, 374 F.2d 627 (2d Cir. 1967), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967) (after short-form merger, plaintiff had right to cash or appraisal); *Voege v. American Sumatra Tobacco Corp.*, 241 F.Supp. 369 (D.Del.1965) (after short-form merger, plaintiff forced to sell to merged corporation, or seek appraisal). The short-form merger cases are distinguishable, since there, plaintiffs were *involuntarily* given the right to cash for their old shares. They could not even remain as shareholders. *National Securities* is closer factually since there the old shareholders became shareholders in the new entity. However, the Supreme Court noted that in that prosecution by the SEC, the issue was whether the merger was a "sale," not whether the shareholders were "sellers." *See* 393 U.S. at 467 n. 9, 89 S.Ct. at 572, 21 L.Ed.2d at 680. Thus, *National Securi-*

*ties* is applicable to the preliminary question of a "sale." In order for *National Securities* to apply, there must be an analogous "new" company into which shareholders have been "forced."

The closest case on this point is *In re Penn Central Securities Litigation*, 347 F.Supp. 1327 (E.D.Pa.1972), *aff'd*, 494 F.2d 528 (3d Cir. 1974), where shareholders of the Railroad had been induced to exchange their shares for shares of a holding company which would then hold 100 per cent of Railroad's stock. The Court of Appeals framed the issue as whether the situation was more like a merger or more like an internal management decision. Was there, as in *National Securities, supra*, a merger of two "separate and distinct" corporate entities, with shareholders receiving stock in a "substantially different company with substantially different assets and prospects"? *See* 494 F.2d at 533–34. The district court had concluded that, instead, "an existing corporation was restructured" with shareholder interests "materially unchanged" since all the changes made would have also been possible by amendment of the articles of incorporation. *See* 347 F.Supp. at 1338. The Court of Appeals agreed, finding the exchange of shares not to be part of a major corporate restructuring. Thus, shareholder investment decisions like those necessary in a proposed merger were not called for, and the merger analogy failed. *See* 494 F.2d at 534.

■ This Court has reached a similar conclusion in the case at bar. Although plaintiffs seek to distinguish the factual situations in *Penn Central* from the instant case, their efforts to not establish that FTI was changed sufficiently after the Plan of Recapitalization to constitute, in effect, a "new" entity analogous to a corporation surviving a merger. Certain changes here are clearly insufficient in this regard: the 9 per cent increase in shareholders' equity interest; the right to receive cash (not involuntary, as in a short-form merger); the changes in par value, number of shares, and number of shareholders. The in-

crease in the market price of the shares does not demonstrate that the new shares would be entirely unmarketable; plaintiffs complain of a decrease in marketability rather than an absence thereof. Indeed, a decrease in marketability cannot transform a corporate recapitalization into a "sale." Corporate insiders could cause such a decrease in a number of ways without creating a "sale." The issue is not whether the marketability was decreased, but instead is whether FTI after the recapitalization was so different as to constitute a new entity. The Court concludes that it was not. Similarly, the facts that FTI could deregister with the SEC after the recapitalization, and that shareholders approving the plan may have lost their appraisal rights do not transform the exchange of shares here into a "sale." Therefore, standing to assert a Section 10(b) claim is lacking for holders of round lots of the old shares, and defendants' motion for summary judgment is granted in this respect as to individual plaintiffs, W. L. Schnorbach and J. D. Gwinn.

## II. *The Sections 10(b) and 14(a) Claims: Damages (Counts I and II ).*

■ Defendants argue that in both the claims under Sections 10(b) and 14(a) of the 1934 Act plaintiffs have failed to allege a legally cognizable measure of damages except concerning the fractional shares redeemed by the corporation. Defendants' arguments in this regard miss the mark. Loss of marketability is a quintessential fact question, unsuited to summary adjudication. There is no reason why the alleged loss of marketability and depreciation in value could not be "actual damages" for the purposes of § 28(a) of the 1934 Act, 15 U.S.C. § 78bb(a). Therefore, defendants' motion for summary judgment on the Sections 10(b) and 14(a) claims is denied.

## III. *The Section 13(d) Claim (Count III).*

### A. *Due Date of Schedule 13D.*

Section 13(d)(1) of the Securities Exchange Act of 1934 (the 1934 Act), 15

U.S.C. § 78m(d)(1), requires those who acquire over five per cent of a class of equity securities registered under Section 12 of the 1934 Act, 15 U.S.C. § 78*l*, to report certain information to the issuer, the exchange, and the SEC within ten days of acquisition. SEC Regulation 13D, 17 C.F.R. § 240.13d–101 (1975), lists the information required in a Schedule 13D. Plaintiffs' third claim alleges that tardy and inaccurate filing of this Schedule 13D by defendant, J. B. Fuqua, damaged FTI stockholders by failing to alert them to his plan to acquire over fifty per cent of the stock whereby he insured approval for his Recapitalization Plan. The key to defendants' motion for summary judgment on this claim is the date when the information should have been filed. If defendants are correct that the form was not due until July 11, 1974, their arguments for summary judgment would be nearly irrefutable. On the contrary, if plaintiffs are correct that the date should have been January 1, 1974, the motion should be denied. The resolution of this question of law becomes, then, the threshold issue at this juncture.

The factual background discloses that in 1971 Fuqua National, Inc., the parent of FTI, was merged into Central Foundry Corporation. *See* W. Schnorbach's Affidavit in Opposition to Defendants' Motion for Partial Summary Judgment, Exhibit "A" at 3 (prospectus); Deposition of J. B. Fuqua at 20. Thus, Central Foundry, later named Gable Corporation, became the sole shareholder of FTI. *See* Affidavit, *supra.* Gable was traded on the New York Stock Exchange and registered under Section 12 of the 1934 Act. *See* Deposition of J. B. Fuqua at 24–25. FTI, having only one shareholder and not traded, was not registered. Then, on May 31, 1973, Gable distributed all of its FTI stock to Gable stockholders as a stock dividend. By this means, two of the plaintiffs obtained their FTI shares. *See* Deposition of J. B. Fuqua at 22; Deposition of W. Schnorbach at 9; Deposition of J. D. Gwinn at 5. Thus, after the spin-off, FTI had sufficient shareholders and assets to require it to regis-

ter under Section 12(g)(1)(B) of the 1934 Act. *See* Defendants' Brief in Support of Partial Summary Judgment at 15. These facts are undisputed.

The dispute concerns the legal question of *when* FTI was required to register under Section 12 of the 1934 Act, because the duty to file under Section 13(d) hinges upon Section 12 registration. Section 12(g)(1)(B) calls for a registration statement within 120 days after the first fiscal year "on which" the issuer meets the criteria for registration. At the time of the spin-off, May 31, 1973, FTI's fiscal year was scheduled to end June 30, 1973. This would make the statement due by October 31, 1973, and effective by December 31, 1973. *See* § 12(g)(1)(B), 15 U.S.C. § 78*l*(g)(1)(b). However, FTI had, in effect, two FY endings in 1973, the first ending June 30th and the second, December 31, 1973, as a result of a change in fiscal years occurring after the spin-off. *See* Answer of Defendant FTI, ¶ 19 at 9. Defendants argue that the short (six-month) FY ending December 31, 1973, should be utilized, making their registration statement due April 30, 1974, and effective July 1, 1974.

Defendants seek to rely on communications between FTI and an SEC staff member to buttress this argument. These communications concerned FTI's duty to report under Section 15(d) of the 1934 Act, 15 U.S.C. § 78*o*(d). Section 15(d) requires issuers who file registration statements under the Securities Act of *1933* to file the same reports that Section 13 of the *1934* Act requires of issuers registered under Section 12 of the *1934* Act. Prior to the 1973 spin-off, FTI apparently filed a *1933* Act registration statement, effective April 17, 1973. *See* Joint Memorandum of Defendants in Opposition to Plaintiffs' Motion to Amend Complaint, Exhibit "A"; Affidavit, *supra,* Exhibit "A". This triggered the reporting requirements of Section 15(d) of the 1934 Act. Thus, a member of the staff of the SEC Office of Registration and Reports wrote the president of FTI that an annual report for the FY

ending June 30, 1973, would be due September 28, 1973, and a quarterly report for the quarter ending September 30, 1973, would be due November 14, 1973. *See* Joint Memorandum, *supra,* Exhibit "A". FTI replied by mentioning the decision to change to a FY ending December 31, and asked if the Annual Report would be due March 30, 1974. *See* Joint Memorandum, *supra,* Exhibit "B". The SEC staffer agreed, *see Joint Memorandum, supra,* Exhibit "C", and sent a revised list of dates: annual report due March 31, 1974; quarterly report for June 30, 1973, due August 14, 1973. *See* Joint Memorandum, *supra,* Exhibit "D".

This correspondence, however, has nothing to do with the filing of a registration statement under Section 12(g) of the 1934 Act. FTI's request for a later filing of the annual report was based on the need for certified financial statements. FTI apparently wanted to economize by having only one such statement for the two FY's covering the 18-month period from July 1, 1972, to December 31, 1973. *See* Joint Memorandum of Defendants, *supra,* Exhibit "B"; Answer of Defendant FTI, ¶ 19 at 9. Nevertheless, FTI was obligated to begin filing quarterly reports covering the quarter ending June 30, 1973. *See* Joint Memorandum, *supra,* Exhibit "D". Thus, the FY ending June 30, 1973 "counted," and the only effect of the staff letter is to opine that the annual report could be based on the altered FY end. Of passing interest is the Commission's Regulation 12B, 17 C.F.R. § 240.12b–25 (1975), which states that "only the most compelling and unexpected circumstances justify a delay in the filing of a report" because of the public's need for this information. Two 30-day extensions of time may be allowed—for documents *"other than* an initial registration statement under section 12(g)." *Id.* (a), (d) (Emphasis added). The date of initial registration may be extended by *the Commission, see* § 12(g)(1) of the 1934 Act, 15 U.S.C. § 78 *l*(g)(1), but apparently not by the staff.

Defendants characterize the correspondence here as an interpretation of SEC regulations upon which they could justifiably rely. They argue that the correspondence is an interpretation that the operative FY end for all purposes became December 31, 1973. This argument is fatally flawed. First, the correspondence has nothing to do with registration under Section 12(g). If there was any doubt on this matter, FTI should have contacted the SEC for clarification. Second, even if the *SEC* would be estopped from asserting a late Section 12(g) filing against *FTI,* the issue here is whether *shareholders* in the class protected by Section 13(d) are to be estopped from asserting tardiness against *defendant Fuqua.* This Court concludes that they are not. To hold otherwise would violate the broad purposes of the 1934 Act which seeks to protect stockholders from just such actions as are the subject of the complaint in the case at bar.

This conclusion is strengthened by defendant Fuqua's consistent filing of information required by Section 16(a) of the 1934 Act, 15 U.S.C. § 78p(a), and 17 C.F.R. § 240.16a (1975) thereunder, during the period in question. Directors and any shareholder holding more than ten per cent of a corporation's securities registered under Section 12 of the 1934 Act must report monthly all changes in their ownership. Defendant Fuqua filed such information beginning December, 1973, for most of his purchases of FTI stock. *See* Deposition of J. B. Fuqua at 24–27 and Exhibit "C". Although his counsel take the position that these reports were *not* required, Mr. Fuqua *behaved as if* FTI were registered under Section 12 in December, 1973—at least so far as Section 16(a) is concerned. If any question remained about Schedule 13D, it would have been very easy to seek clarification from the SEC. Such clarification was not sought, and defendant Fuqua should not be insulated from liability on these facts. This Court concludes that defendant Fuqua's Schedule 13D was due on January 10, 1974, ten days after his acquisition of five per cent of a class of registered stock.

For the record, there is now no dispute that the Schedule 13D was effectively filed July 18, 1974, since that is the date of receipt by the SEC. *See* Deposition of J. B. Fuqua, Exhibit "D"; 17 C.F.R. § 240.0–3 (1975). Defendants have admitted this was "a few days late" based on their contention it was due July 11, 1974. *See* defendants' Statement of Material Facts, ¶ 7 at 3. Thus, defendants admit at least a technical violation of Section 13(d).

Finally, plaintiffs argue that SEC Rule 12g–3(a), 17 C.F.R. § 240.12g–3(a) (1975), is an alternative basis for FTI registration. However, that rule concerns a "succession" by merger, etc., which did not occur in the 1973 spin-off, since FTI did not acquire the assets of Gable. *See* 17 C.F.R. § 240.12b–2(t) (1975). Rule 12g–3(a) is, therefore, inapplicable here.

### B. *Legal Sufficiency of Section 13(d) Claim.*

 Defendants make five objections to the legal sufficiency of the Section 13(d) claim. Three of these objections depend on the argument that the Schedule 13D was not due until July 11, 1974. Since this contention has been rejected, the arguments dependent on it must likewise be rejected. Defendant Fuqua increased his 24 per cent ownership of FTI to over 50 per cent in the period between December, 1973, and April, 1974. *See* Deposition of J. B. Fuqua at 21, 24, and Exhibit "C"; Joint Memorandum of Defendants, *supra* at 11. On January 10, 1974, he should have filed Schedule 13D with appropriate amendments thereafter. *See* Section 13(d)(2). Thus, the arguments that there was no "intensity of demand" to reveal in July, that plaintiffs were not injured because there were no purchases in July, and that there was no effort to obtain control after the Schedule 13D was due, must be rejected. SEC Regulation 13D, 17 C.F.R. § 240.13d–101 (1975) requires the *purpose* of the transaction to be revealed. If the purpose is to acquire control, plans for any "major change" in the issuer must be revealed. This rule was noted with seeming approval by the Supreme Court in *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 51, 95 S.Ct. 2069, 2072, 45 L.Ed.2d 12, 17, 43 U.S.L.W. 4768, 4769 n. 1 (1975). Thus, the following material questions of fact exist: whether the late filing of Schedule 13D deprived the corporation and shareholders of information required by Section 13(d) concerning the purpose of the purchases; whether this caused damage to the plaintiffs; whether the Schedule 13D as filed damaged the plaintiffs. Thus, the resolution of these factual questions proscribes summary judgment on this claim.

Defendants make two other objections: first, that "intensity of demand," referred to by plaintiffs, need not be revealed in a Schedule 13D. Even if this were so, the material fact questions listed above would remain. Second, defendants argue that the class plaintiffs seek to represent—stockholders as of December 11, 1974—is not the same as the class protected by Section 13(d). This contention misreads that provision, which would protect all who obtained shares by December 11, 1974, and held them on that date. This follows from the main purpose of Section 13(d): to give the corporation and thereby its stockholders information necessary to respond adequately to large stock purchases involving an effort to obtain control. *See Rondeau v. Mosinee Paper Corp., supra,* 422 U.S. at 58–59, 95 S.Ct. at 2075–76, 45 L.Ed.2d at 20–21, at 4770–71. If the Schedule 13D had been properly filed, with necessary amendments, the shareholders, including those who may have purchased between January 10, 1974, and December 11, 1974, might have had significant information they were lacking. This is a material question of fact. For this and the other foregoing reasons, defendants' motion for summary judgment on the Section 13(d) claim must be denied.

### IV. *The Claim of Ultra Vires Activity (Count IV).*

 Defendants contend that this Court lacks subject-matter jurisdiction

over plaintiffs' fourth claim, concerning alleged *ultra vires* activity. As a preliminary matter, it should be pointed out that the proper method of raising this point is by a motion to dismiss or in a responsive pleading. *See* 6 J. Moore, *Federal Practice* ¶ 56.03 (1975). Regardless of this defect, it is clear that defendants' contention on this point is without merit. Plaintiffs allege that the suspect joint venture was part of a plan to reduce the reported earnings of FTI in order to facilitate shareholder approval of the Recapitalization Plan, including its $3 per share valuation. Thus, the alleged violations of the securities laws and the alleged *ultra vires* activity may have been part of one design. These claims "derive from a common nucleus of operative fact," *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218, 228 (1966), and judicial economy would be served by combining them into one action.

Defendants further contend that even if pendent jurisdiction exists, Count IV fails to state a claim under Georgia law, since the joint venture with Hytech was within the inherent general powers granted to Georgia corporations under *Georgia Code* § 22–202. FTI's Articles of Incorporation specify as corporate purposes the owning and operating of broadcasting stations, adding general language that the corporation is to have all rights granted to Georgia corporations by the State. These rights, under *Georgia Code* § 22–202(10) and (12), include participation in ventures and lending money. Plaintiffs argue, however, that the rule of *ejusdem generis* would limit the proper functions of FTI to those related to the purpose specifically named, broadcasting. Although the rule of *ejusdem generis* is accepted by Georgia courts, *see Gilmore v. Gilmore,* 201 Ga. 770, 777, 41 S.E.2d 229 (1947), there appears to be no Georgia case applying this rule in the context of *Georgia Code* § 22–202, which is part of a recent (1969) revision of the Georgia Corporations Code. This Court concludes that there is an insufficient factual basis as yet to define precisely FTI's arrangements with Hytech. In such a situation, summary judgment would be improper because "the Court should refuse to grant a motion for a summary judgment until the facts and circumstances have been sufficiently developed to enable the Court to be reasonably certain that it is making a correct determination of the question of law." *Palmer v. Chamberlin,* 191 F.2d 532, 540 (5th Cir. 1951). The motion for summary judgment as to Count IV is denied.

## V. The Claim of a Breach of Fiduciary Duty (Count V).

Although defendants' motion for partial summary judgment asks this Court to dismiss "all claims" on behalf of those who are not "purchasers" or "sellers" within the purview of the securities laws, defendants have not related this position in any way to Count V. The claims of the individual plaintiffs, W. L. Schnorbach and J. D. Gwinn have been dismissed under Count I for lack of standing, but their claims under Counts II, III, and IV still exist. No reason being evident for dismissal of their claims under Count V, the motion for partial summary judgment on this count is denied.

## ORDER CERTIFYING CLASS

Upon examination of the facts and circumstances of this case, this Court finds that, for the reasons stated in part I, *supra,* certification of a class consisting of all fractional shareholders on the date of the mailing of the proxy statement in issue is proper. This definition of the class excludes two of the plaintiffs, W. L. Schnorbach and J. D. Gwinn, who may proceed with their individual claims in joinder with the class claims. Accordingly, the class is hereby certified pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, as follows:

"A class consisting of all fractional shareholders, that is, all holders (except officers and directors of Fuqua Television) of less than 100 10-cent par value common shares, of Fuqua Television, Inc., on December 11, 1974."

The parties shall, within fifteen (15) days hereof, submit to the Court proposed forms of notice.

Based on the foregoing class definition, defendants' motion for partial summary judgment is disposed of as follows. The motion as to all plaintiffs and the class on Counts III and IV is denied. The motion as to the individual plaintiffs, W. L. Schnorbach and J. D. Gwinn, is granted on Count I, and denied on Counts II and V.