**Janet ZIEMACK, Kenneth Z. Slater, and Ellen Z. Slater, Herbert Eisenstadt, Joseph Meyer, Harvey Meyer, and Brenda Drucker, Plaintiffs,**

**v.**

**CENTEL CORPORATION, John P. Frazee, Jr., and J. Stephen Vanderwoude, Defendants.**

**No. 92 C 3551.**

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 19, 1995.

Michael David Craig, Richard S. Schiffrin, Schiffrin & Craig, Ltd., Buffalo Grove, IL,

for Janet Ziemack, Kenneth Z. Slater, Ellen Z. Slater, Herbert Eisenstadt, Joseph Meyer, Harvey Meyer and Brenda Drucker.

Christina M. Tchen, Susan Getzendanner, Matthew Robert Kipp, Skadden, Arps, Slate, Meagher & Flom, Chicago, IL, for John P. Frazee, Jr. and J. Stephen Vanderwoude.

*MEMORANDUM OPINION*

BRIAN BARNETT DUFF, District Judge.

In this securities fraud class action, the Defendants move to modify the plaintiff class to exclude holders of equity in the Sprint Corporation. In the alternative, they move to require proof-of-claim discovery from absent class members. For the reasons discussed below, the Court denies both motions.

I

Should courts exclude from membership in the plaintiff class holders of equity in a corporation defending allegations of fraud under the federal securities laws? Rule 23(a)(4) of the Federal Rules of Civil Procedure dictates that adequacy of representation is a necessary prerequisite for a class action to proceed.[1] Courts interpret this rule by culling out of the class putative members whose interest in establishing liability clashes with that of the named representatives. *See Secretary of Labor v. Fitzsimmons,* 805 F.2d 682, 697 (7th Cir.1986); *In re Seagate Technology II,* 843 F.Supp. 1341, 1362–64 (N.D.Cal.1994); *Werner v. Satterlee, Stephens, Burke & Burke,* 797 F.Supp. 1196, 1215 (S.D.N.Y.1992) (quoting *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir.1992), quoting in turn *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 562 (2d Cir.1968)).

The facts of this case are fully set out elsewhere. *See Ziemack v. Centel,* 856 F.Supp. 430 (N.D.Ill.1994). Briefly, a class of plaintiffs sued Centel Corporation and two of its directors under the federal securities laws for alleged misrepresentations which they say inflated Centel's share price during negotiations for the sale of the company. Sprint Corporation ultimately purchased Centel, and now owns all of the rights and obligations of Centel pertaining to this lawsuit. Within the class as currently defined are current holders of Sprint equity as well as current nonholders of Sprint equity. The Defendants have moved to modify the class to exclude current holders of Sprint equity.

Exclusion of equity holders has an intuitive appeal. Imagine putting in a room all present shareholders of the defendant corporation who are otherwise entitled to be members of the plaintiff class. Ask them if they are in favor of the present litigation going forward. Those who stand to lose more from any decline in share value due to the payment of a judgment than they would gain in damages would answer no. In fact, the Defendants suggest that at least 25% of the defendant corporation is owned by putative class members. (Reply at 4). Why would these shareholders, in effect, have an interest in suing themselves?

The problem with this result is that it is antithetical to the very concept of a securities fraud class action. Axiomatically, plaintiffs who allege purchasing shares in a developed market at fraudulently inflated prices will be shareholders. Indeed it is likely that the number of equity holding putative class members in this case (25% according to the Defendants) is unusually low, an artifact of the lengthy passage of time since this case began. More typically, when a court would reach this question is at the beginning, in the first few months of the filing of an action. In these cases we might expect the potential antagonism to infect nearly all class plaintiffs. *Accord Feder v. Harrington,* 52 F.R.D. 178, 182 (S.D.N.Y.1970).

II

So ubiquitous a conflict within a securities plaintiffs' class finds scarce acknowledgement in the case law. In *In re Seagate Technology II,* 843 F.Supp. 1341 (N.D.Cal. 1994) (Walker, J.), the plaintiffs alleged the fraudulent concealment of material informa-

1. "One or more members of a class may sue or be sued as representative parties on behalf of all only if ... (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a).

tion in connection with the purchase of shares in the defendant company. The court identified substantial concerns about including equity holders in the plaintiff class. Reasoning that courts had too often been "[d]riven perhaps by an overarching desire to effectuate the securities laws and provide relief for small-claim plaintiffs," *id.* at 1359, the court concluded that most courts had "failed to address the importance that the fraud-on-the-market theory gives to class conflicts over price inflation." *Id.* One of those conflicts is the

> dual interest[ ] held by some members of the plaintiff class. Specifically, those plaintiffs who still own shares of the relevant security at the date of suit have divided loyalties: on the one hand, they hope for recovery for themselves; as equity holders in the relevant issuer, however, they also wish to minimize the overall liability of the company.

*Id.* at 1362. The court surveyed some of the few cases to have addressed the issue and found their reasoning unconvincing that the conflict went to mere disagreements about damages. The court stated,

> If, in fact, the individual plaintiff is more interested in personal recovery than the overall welfare of the company, this only addresses the reason for the individual's participation in the class suit. The mere fact that he prefers himself over the corporation in no way indicates that he would be agreeable to hundreds or thousands of other plaintiffs receiving damage awards at the expense of the company in which he possesses equity.

*Id.* at 1362. In a later opinion in the same case, the court acknowledged that some adversity in a class action must be tolerated and declined to exclude equity holders. *In re Seagate Technology II,* 156 F.R.D. 229, 231 (N.D.Cal.1994). In more recent cases, that court has continued to insist that parties to a securities action address the equity conflict identified in *Seagate II. See In re California Micro Devices,* 1995 WL 476625, at *6 (N.D.Cal. August 4, 1995) (Walker, J.); *In re Clearly Canadian,* 875 F.Supp. 1410, 1422 (N.D.Cal.1995) (Walker, J.).

One must go back almost twenty years before *Seagate II* to find a case that similarly held equity holders excluded. In *Schnorbach v. Fuqua,* 70 F.R.D. 424 (S.D.Ga.1975), four minority shareholders complained of fraudulent statements allegedly made in connection with a proxy solicitation. The class contained two kinds of plaintiffs: fractional shareholders whose shares were redeemed before suit (i.e., nonholders of equity) and round lot shareholders who still possessed their shares (i.e., holders of equity). After the court's exhaustive survey of cases identified "only two [that] directly held against representation of both past and present shareholders," *id.* at 430, the court nevertheless excluded the round lot shareholders. *Id.* at 435. The primary reason for excluding equity holders was "that the recovery sought would benefit the non-equity interest at the expense of the equity interest." *Id.* at 430. Influencing the court's decision was the intervention of employee shareholders who rallied against certification. *Id.* at 435. They had complained that success of the plaintiff class would threaten their jobs. The court stated, "although the opposition expressed here is insufficient to require a denial of certification, altogether, it is another factor to be weighed in the proper disposition of this question." *Id.*

Most of the rare cases that address the equity holder/nonholder conflict do not recognize it as engendering antagonism among class members. For example, in *Walsh v. Chittenden Corporation,* 798 F.Supp. 1043 (D.Vt.1992), the plaintiff owned at least 900 shares of the defendant corporation and brought an action alleging, *inter alia,* securities fraud affecting the price paid for 100 of those shares. The defendants opposed class certification. They argued that the plaintiff possessed a conflict of interest with the putative class members "because a large judgment or settlement in this action could drive down the market price of Chittenden stock, causing plaintiff further losses...." *Id.* at 1054. The court rejected this argument as "entirely too speculative a basis (and unsupported by authority) for concluding that plaintiff will not represent the class adequately." *Id.*

Similarly, in *Jenson v. Continental Financial Corp.,* 404 F.Supp. 806 (D.Minn.1975), the plaintiffs purchased unregistered securities from the defendants who allegedly engaged in fraudulent misrepresentations in connection with the sale. *Id.* at 811. The defendants opposed class certification. They pointed to potential conflicts between the representative parties who still held their investment and the other members of the class who had liquidated. *Id.* The court held that "[a]lthough the interests of the parties who still hold their investment may differ from the interests of those who have liquidated, it is not so substantial a conflict so as to preclude class action treatment." *Id.* The court reasoned that any conflict went only to damages and that all class members' interests in establishing "central issues" of the misrepresentations were coextensive. *Id.* Other cases follow similar reasoning. *See Seagate II,* 843 F.Supp. at 1362–64 (citing cases); *Schnorbach,* 70 F.R.D. at 428–36 (citing and surveying cases).

The Seventh Circuit has never treated the equity holder/nonholder conflict. In two cases, however, that court has addressed similar conflicts in its review of class settlement agreements. The results are inconsistent. In *Secretary of Labor v. Fitzsimmons,* 805 F.2d 682 (7th Cir.1986), a pension fund case, the court sitting *en banc* identified "an obvious conflict of interest" where "for every dollar that is expended or paid out from the Teamster's pension fund on benefits for the eligible members of the benefit group, there will be one less dollar available to provide benefits for the asset mismanagement group...." *Id.* at 698. This situation is comparable to that at bar, in which a judgment for class plaintiffs would diminish corporate cash flows. The court of appeals reversed the district court's approval of the class settlement in that case because the "asset mismanagement group" should not have been certified within the same class as the "benefit group." *Id.* at 699. The class representatives belonged to the benefit group. Interpreted broadly, *Fitzsimmons* suggests exclusion of putative class members who would suffer losses in proportion to other class members' gains from the litigation. Left open is the question of how to treat conflicting interests that vary from one class member to the next.

*McDonald v. Chicago Milwaukee Corp.,* 565 F.2d 416 (7th Cir.1977) cuts the other way. In *McDonald,* the named representative sued the defendant railroad. He sued as a holder of debt instruments, or put another way, in the capacity of a creditor. He also held 100 shares of equity in the railroad. Objectors challenged the class settlement approved by the district court. They argued that the named representative could not represent the interests of debt holders (the class members) in an arms length settlement negotiation because of the conflict of interest of one who simultaneously holds stock and debt instruments. *Id.* at 421. After acknowledging the logic of the objectors' argument, the court ultimately rejected it. The court strongly relied on the fact that the objectors had voiced the same concerns in the district court. *Id.* at 422. Importantly, the district court found that no conflict had actually materialized during settlement negotiations and approved the settlement with awareness of the objectors' concerns. The court of appeals stated,

> In effect, we are ruling that parties other than "pure" shareholders or "pure" creditors are certifiable as class representatives. Thus we are determining that [sic] litigation context warrants a finding that the interests of shareholders and debenture holders can ultimately prove to be, as in this case, wholly compatible despite the theoretical existence of a conflict.

*Id.* Interpreted broadly, *McDonald* suggests that a certain level of antagonism among the interests of class members is permissible, especially if no conflict ever actually materializes. Left open is the question of how much "theoretical" antagonism undermines adequate representation so as to require modification of a class.

## III

This Court recognizes that antagonistic interests exist between equity holders and nonholders but, for both historical and practical reasons, the Court will not exclude the equity holders from the present class. The district court cases mentioned above go only

so far to guide this Court to the correct conclusion. Those cases holding for exclusion of equity holders offer no principled method for choosing which equity holders, if any, to exclude. They also fail to recognize the danger that doing so might eviscerate the private cause of action as a tool for the enforcement of the securities laws.

Those cases holding against exclusion of equity holders are even less helpful because they are based on the faulty assumption either that a conflict involves mere disagreements about damages or that it is too speculative. In the memorandum opinion of September 22, 1995, this Court noted, "When sub-groups of class members have conflicting positions on a key element of trial strategy for establishing liability, the sub-groups have interests adverse to each other." *Ziemack v. Centel,* 163 F.R.D. 530, 541 (N.D.Ill.1995). It is also not open to dispute that a large award against the defendant company would diminish corporate wealth and potentially lower share prices. *See* Janet C. Alexander, The Value of Bad News in Securities Class Actions, 41 U.C.L.A. L.Rev. 1421, 1435–36 (1994) ("Once the suit is filed, substantial economic consequences are virtually certain."); Reinier Kraakman *et al.,* When are Shareholder Suits in Shareholder Interests?, 82 Geo.L.J. 1733, 1759 (1994) ("Presumably, shareholders would wish to bring only those actions that will increase the value of shareholdings."); Daniel R. Fischel II, Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities, Bus.Law. vol. 38 (November 1982).

Likewise, Seventh Circuit precedent does not dictate the correct analysis. The precedents are factually distinguishable and pull in opposite directions. Furthermore, they leave important questions open.

The correct disposition comes from balancing the reasons behind the class action requirement of fair and adequate representation with the reasons behind the allowability of private causes of action for the enforcement of securities laws.

A.

At the heart of Rule 23(a)(4) is the concern that absent class members should not be deprived of due process in an action that conclusively determines their legal rights. The Supreme Court articulated this concern in *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). In that case, black landowners defended a suit which white landowners brought to enforce a racially restrictive covenant. *Hansberry,* 311 U.S. at 37, 61 S.Ct. at 116. The black landowners defended by claiming that the covenant never became enforceable because a condition precedent never existed. *Id.* The covenant was only enforceable if owners of 95% of the frontage had signed the agreement. *Id.* The black landowners established in the trial court that owners of only 54% of the frontage had signed it, but that court held the enforceability of the covenant was *res judicata. Id.,* 311 U.S. at 38, 61 S.Ct. at 116–17. In earlier unrelated class litigation, there was a stipulation, undisputedly false, that owners of 95% of the frontage had signed the agreement. *Id.* The black landowners in *Hansberry* did not participate in that earlier litigation which contained the stipulation. The black landowners ultimately appealed to the Supreme Court, arguing that it was unfair to hold the false stipulation against them. The Court held for the black landowners, reasoning that the constitution prohibited the stipulation from serving as *res judicata* against absent class members. The Court stated, "there has been a failure of due process ... in those cases where it cannot be said that the procedure adopted, fairly insures the protection of the interests of absent parties who are to be bound by it." *Id.,* 311 U.S. at 42, 61 S.Ct. at 118. There was such a failure in *Hansberry* because "[t]hose who sought to secure [the covenant's] benefits by enforcing it [in the earlier litigation] could not be said to be in the same class with or represent those whose interest was in resisting performance...." *Id.,* 311 U.S. at 44, 61 S.Ct. at 119.

Admittedly, the scope of Rule 23(a)(4) is greater than the scope of the due process clause. However, due process defines the outer limits of this Court's discretion in ruling on class certification issues. The due process underpinnings of Rule 23(a)(4) do not

dictate exclusion of equity holders. Legal rights are conceptually separate from financial interests. Due process only entails notice and an opportunity to be heard concerning one's entitlement to a legal right. In *Hansberry,* the legal right was the right to be free of the enforcement of a racially restrictive covenant. In this case, the legal right is the right to recover damages from the allegedly inflated share purchase prices paid for Centel shares during the class period. A coincidental stake in the outcome, by itself, grants no rights under the due process clause that would entitle someone to have a say in the conclusive determination of damages in a securities fraud class action.

B.

Further, the exclusion of equity holders from securities fraud suits would be an unwarranted back door method for virtually eliminating the private right of action under the securities laws. Antifraud actions involving the purchase of securities would likely evaporate if plaintiff classes necessarily excluded equity holders. As discussed above, in the early stages of litigation, almost all plaintiffs own shares.

An implied private right of action is solidly established under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5. *See Superintendent of Insurance v. Bankers Life and Casualty Co.,* 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 169 n. 9, 30 L.Ed.2d 128 (1971). The reasons for establishing this private right of action in fraud cases are set out in the earlier case that established a private right of action in the enforcement of proxy solicitation rules. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730, 95 S.Ct. 1917, 1923, 44 L.Ed.2d 539 (1975). In *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), the Supreme Court ratified an implied right of action in the enforcement of Section 14(a) of the Securities Exchange Act of 1934 ("the Act") (pertaining to proxy solicitations) for several reasons. First, Congress passed the Securities Exchange Act of 1934 for "broad remedial purposes." *Id.,* 377 U.S. at 431, 84 S.Ct. at 1559. Second, the Act's language stated that the Securities Exchange Commission had authority to prescribe rules for "the protection of investors." *Id.,* 377 U.S. at 432, 84 S.Ct. at 1559. Third, and perhaps most important, "[p]rivate enforcement of the proxy rules provides a necessary supplement to Commission action.... Time does not permit an independent examination of the facts set out in the proxy material and this results in the Commission's acceptance of the representations contained therein at their face value...." *Id.,* 377 U.S. at 432, 84 S.Ct. at 1560. Fourth, "if federal jurisdiction were limited to the granting of declaratory relief, victims of deceptive proxy statements would be obliged to go into state courts for remedial relief. And if the law of the State happened to attach no responsibility to the use of misleading proxy statements, the whole purpose of the section might be frustrated." *Id.,* 377 U.S. at 434–45, 84 S.Ct. at 1561. Finally, "the hurdles that the victim might face (such as separate suits, ... security for expenses statutes, bringing all parties necessary for complete relief, etc.) might well prove insuperable to effective relief." *Id.,* 377 U.S. at 435, 84 S.Ct. at 1561.

These considerations remain viable, if not entrenched. Limiting the class action form so drastically would directly clash with the goals behind private enforcement of the securities laws. Moreover, this Court is reluctant to travel a path that almost all other courts have avoided. If the problem of equity holder/nonholder conflicts was truly of great concern, one might expect richer development in the caselaw. The presence of only a handful of cases on point, when the issue might have been raised a thousand times in recent decades, suggests that defendants rarely press the issue. It is telling that the defendants here did not raise the issue until this court highlighted the *Seagate II* opinion in its September 22, 1995 memorandum opinion.

C.

This analysis so far has not even touched on the practical difficulties inherent in deciding whom to exclude. Those whose losses upon a judgment against the Defendant corporation will be greater than their gains from any damages will oppose the litigation. One may express this condition mathematically:

$h_iH * (Sum_i[P_i * (PL_{pi} - VL_{pi})] + C) > P_i * (PL_{pi} - VL_{pi})$.

The right side of the equation represents out-of-pocket damages for a generic plaintiff. "PL" represents the price line, "VL" represents the value line, and subscript p represents the time of purchase. "$P_i$" is the number of shares purchased during the class period by class plaintiff i. "$(PL_{pi} - VL_{pi})$" represents the difference between the price and value of a share of a defendant corporation purchased by i at time p.

The left side of the equation represents the *pro rata* share of any liability that the same plaintiff must bear upon a judgment. "H" represents the gross number of shares in existence at the time of suit, "$h_i$" represents the number of shares class plaintiff i holds at the time of suit, and C represents costs of litigation borne by the corporation, such as attorney fees. "$Sum_i[P_i * (PL_{pi} - VL_{pi})]$" represents aggregate damages of the entire class summed over all plaintiffs. *See generally Seagate II,* 843 F.Supp. at 1348–50.

■ Plainly, the value line, VL, the costs of litigation, C, and the number of class share purchases, Sum(P), are all indeterminate prior to a trial on the merits. These are not questions a court can answer to any degree of satisfaction at the class certification stage. Indeed, courts are prohibited. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974). The *Eisen* Court observed,

> We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.... [A] preliminary determination of the merits may result in substantial prejudice to a defendant, since of necessity it is not accompanied by the traditional rules and procedures applicable to civil trials.

*Id.*

## IV

■ The Defendants request if the Court does not modify the class, that they be allowed to serve proof-of-claim discovery. Doing so, they say, "will ensure that equity-holding class members will not unwittingly be included in the class to the potential detriment of their interests." (Mem. in Support at 6).

This request has no merit. Rule 23(c)(2) provides, "The [class] notice shall advise each member that (A) the court will exclude the member from the class if the member so requests ...; (B) the judgment, whether favorable or not, will include all members who do not request exclusion." Fed.R.Civ.P. 23(c)(2). The Plaintiffs argue that requiring a proof-of-claim is tantamount to an "opt-in" procedure, unequivocally disfavored because of the clear language in Rule 23(c)(2) favoring an "opt-out" policy. *Accord Manual for Complex Litigation, Third* § 30.232 (1995) ("Class members are sometimes called on to provide the court with information regarding their individual claims. This may be appropriate in connection with preparation for the second stage of a bifurcated trial ... or the determination of entitlement to individual relief under a judgment or settlement.... Class members should not, however, be required to submit proofs of claim as a condition of membership in the class, which would be equivalent to establishing an opt-in procedure.")

The Defendants have provided insufficient reasons for carving an exception in this case. Equity holding members of the class will prefer to be included in the class if any recovery is to be had. If they suffer losses because of a judgment, then class membership allows them to cut those losses. It is not that they wish to be excluded; rather, they wish all other plaintiffs to be excluded.

## *CONCLUSION*

The certification decision is a discretionary one in the district court. Some antagonism of interests within a plaintiff class is tolerable and inevitable. The motion to modify the class definition is denied.

The class is defined as:

> All persons and entities who purchased the common stock of Centel during the period from January 23, 1992 through May 27, 1992, inclusive, who retained those shares

throughout that period and who were damaged, except Centel, its subsidiaries and affiliates, the individual defendants, other officers and directors of Centel, members of the immediate family of each of the individual defendants, any entity in which any defendant has a controlling interest, and the legal representatives, heirs, successors and assigns of any such excluded party.