### In re COMMONPOINT MORTGAGE COMPANY, Debtor.

No. GG 98–09338.

United States Bankruptcy Court,
W.D. Michigan.

Sept. 19, 2002.

John E. Anding, Drew, Cooper & Anding, Grand Rapids, Michigan, and Harold E. Nelson, Borre, Peterson, Fowler & Reens, PC, Grand Rapids, Michigan, for movants.

Michael W. Donovan, and Joshua M. Wallish, Varnum, Riddering, Schmidt & Howlett, LLP, Grand Rapids, Michigan, for Elizabeth C. Chalmers, Chapter 7 Trustee.

## OPINION REGARDING CERTIFICATION OF CLASS PROOF OF CLAIM

JAMES D. GREGG, Chief Judge.

### I. ISSUE

Should this court certify a class based upon a class proof of claim filed on behalf of a group of individuals who received loans from the Debtor, CommonPoint Mortgage Company ("CommonPoint"), between 1991 and 1997?

### II. JURISDICTION

The court has jurisdiction over this bankruptcy case. 28 U.S.C. § 1334. The case and all related proceedings have been referred to this court for decision. 28 U.S.C. § 157(a) and L.R. 83.2 (W.D.Mich.). This contested matter is a core proceeding because it pertains to the administration of the estate, 28 U.S.C. § 157(b)(2)(A), involves the allowance or disallowance of claims against the estate, 28 U.S.C. § 157(b)(2)(B), and affects the liquidation of the assets of the estate, 28 U.S.C. § 157(b)(2)(O).

### III. PROCEDURAL HISTORY

Sandra VanDerBroeck, Eugene Nichoson, Carol Nichoson, Abel Soto and Denise Soto (the "Movants") filed this motion on behalf of themselves and thousands of similarly situated individuals who received loans from CommonPoint between October 1, 1991 and October 1, 1997. Movants allege that, in connection with these loans, CommonPoint: (1) charged fees for services that were never provided; (2) charged excessive fees in breach of CommonPoint's contractual and fiduciary duties; (3) charged "hidden fees," which CommonPoint had a fiduciary duty to disclose; (4) charged illegal fees; and (5) committed violations of the Michigan Consumer Protection Act (MCPA), MICH.COMP. LAWS ANN. § 445.901 et seq. (West 1989).

The Movants first pursued their claims against CommonPoint in 1997, when they filed a complaint on behalf of the class in the United States District Court for the Western District of Michigan. The district court dismissed the Movants' claims under the federal Truth in Lending Act (TILA), 15 U.S.C. § 1601 et seq., and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq., on October 13, 1998. The district court also dismissed Movants' corresponding state law claims without prejudice.

On October 16, 1998, the Movants filed another complaint in the Kent County Circuit Court for the State of Michigan (the "state court"). The complaint joined ContiMortgage and GreenTree Mortgage ("Greentree"), two companies who purchased high cost mortgages from CommonPoint, as defendants. Thereafter, on November 10, 1998, CommonPoint and ContiMortgage removed the case to the United States District Court for the Western District of Michigan. Movants' First

Amended Complaint was filed in the district court on November 17, 1998.

On October 21, 1998, an involuntary chapter 7 petition was filed against CommonPoint in this bankruptcy court. An order for relief was entered on the involuntary petition on November 12, 1998. Elizabeth Chalmers was appointed as the chapter 7 trustee.

After the bankruptcy filing automatically stayed the district court action against CommonPoint, the district court remanded Movants' claims against ContiMortgage and GreenTree Mortgage to the state court, which certified a class. The Movants' claims against ContiMortgage were ultimately settled. The claims against GreenTree were fully litigated and resulted in a state court judgment in the Movants' favor.

On March 19, 2001, the Movants filed a Proof of Claim on behalf on themselves and the class, in the amount of $27,368,062.99 (Claim No. 240). On December 17, 2001, the Movants filed a motion, requesting that this court apply FED. R.BANKR.P. 7023 and certify a class. The chapter 7 trustee opposes the motion.

## IV. FACTS AND LEGAL THEORIES

### A. General Factual Background.

The potential class in this case is comprised of current or former Michigan citizens who received loans from CommonPoint between October 1, 1991 and October 1, 1997, and who were allegedly charged hidden and inappropriate fees in connection with the loans. *See* Vanderbroeck, Nichoson, and Sotos' Motion to Apply FED.R.BANKR.P. 7023 and to Certify Class (the "Motion") at 1. CommonPoint operated a residential mortgage financing business in branch offices throughout the state of Michigan.[1] CommonPoint provided residential mortgage financing to approximately 14,527 consumers in the state of Michigan.[2] *See* Vanderbroeck, Nichoson and Sotos' Brief in Support of Motion to Apply FED.R.BANKR.P. 7023 and to Certify Class ("Movants' Brief") at 13. The claims of potential class members average about $2,000 each. *See* Transcript of Hearing on the Motion at 8–9 (hereinafter "Tr. at ____."). CommonPoint was generally known to be a subprime lender,[3] and it has been argued that the great majority of potential class members lack business sophistication. Tr. at 21–22.

### B. The Form Documents.

CommonPoint's potential liability to each borrower may be ascertained by referring to three relevant form documents.

---

1. According to the CommonPoint's schedules, it owned real property in Grand Rapids, Ionia, and Muskegon, Michigan. CommonPoint also leased business premises in Freeland, Grand Rapids, Lansing, Okemos, Southfield, and Traverse City, Michigan. Docket No. 376.

2. Of these consumers, Movants allege that approximately 9,617 individuals qualify for class membership because they were charged a "document preparation fee" in violation of Michigan law, 6,576 people are eligible for membership because they were charged a "loan discount" fee when no corresponding discount was given, and 8,953 individuals are eligible for membership because CommonPoint received an undisclosed "back end" fee from their loans. Movants' Brief at 13; Motion at 3.

3. The Federal Deposit Insurance Corporation ("FDIC") defines subprime lending as "extending consumer credit to individuals with incomplete or somewhat tarnished credit records who often are unable to obtain traditional financing." Risks Associated with Subprime Lending, 6 Fed. Banking L.Rep. (CCH) ¶ 63–782, at 73,274 (May 2, 1997).

These documents were executed routinely in connection with virtually every loan made by CommonPoint from 1991 through 1997. The first document, the Financial Services Agreement, is an agreement between the borrower and CommonPoint, pursuant to which CommonPoint agrees to act as the borrower's agent in securing residential mortgage financing. *See* Movants' Brief, Exhs. 1 and 2. In addition, the Financial Services Agreement sets forth the maximum fee that will be assessed in connection with the resulting loan.

The second document, the Closing Document Form and Commission Sheet, also contains important information. Movants' Brief, Exh. 4. First, the document discloses the "buy rate," that is, the rate at which the loan could have been sold to a secondary lender. It also discloses the note rate actually delivered to the borrower. Second, the Closing Document reveals a "back end" or "upsell" fee that was allegedly received by CommonPoint in a number of loan transactions. This "back end" fee represents the premium CommonPoint received from the secondary lender when it sold the note at a rate in excess of the buy rate. Significantly, the Closing Document was generated internally by CommonPoint employees. Individual borrowers were allegedly not given a copy of this document.

The third document, the Settlement Statement (or HUD–1), discloses all fees that were assessed against the borrower in connection with the loan. Movants' Brief, Exh. 5. This document also discloses that, in many instances, CommonPoint charged a "loan preparation fee" and a "discount fee" in connection with its loans. The information *lacking* on the Settlement Statement may also be significant. For example, the Settlement Statement fails to disclose that a "back end" or "upsell" fee, as shown by the Closing Document Form, was received by CommonPoint from the loan.

The Movants' attorneys have created a computerized database. The database contains copies of the Financial Services Agreements, the Closing Document Forms, and the Settlement Statements for each potential member of the class action, organized by the members' name and address. Tr. at 12–13.

### C. Movants' Legal Theories.

The Movants' allege that CommonPoint repeatedly violated Michigan law from October 1, 1991 to October 1, 1997. The state law claims asserted by the potential class are divided into three major categories. The asserted claims may be proven or disproven by examining the three standardized documents.

### 1. Claims under the Michigan Consumer Protection Act.

The Movants' first set of claims against CommonPoint arise under the MCPA. These claims primarily involve the fees CommonPoint charged its borrowers in connection with the loans it made.

The Movants allege that CommonPoint charged many borrowers a "discount fee" when no discount was ever provided, thereby violating the MCPA. Movants' Brief at 6. In each transaction, the Settlement Statement reveals whether a "discount fee" was charged. Movants' Brief, Exh. 5. The question of whether a discount was actually received can be answered by comparing the "buy rate" with the actual rate for each loan. Those numbers are shown in CommonPoint's internally generated Closing Documents. Movants' Brief, Exh. 4.

The Movants contend that, in many cases, the actual fees assessed against each borrower exceeded the maximum fee

amount set forth in the Financial Services Agreement. Movants' Brief at 7. The actual amount of fees assessed in connection with each loan transaction may be ascertained by adding all fees disclosed in the Settlement Statement to the "back end" fees revealed in the Closing Document. Movants' Brief at 7, Exh. 4 and 5. The sum of the actual fees may then be compared with the maximum allowable fees permitted by the Financial Services Agreement to determine whether a breach of the Financial Services Agreement occurred.

The Movants also contend that CommonPoint violated the MCPA by causing a probability of confusion or failing to reveal: (1) facts about the agency relationship created by the Financial Services Agreement; (2) that the payment of the loan discount fee did not result in a discounted interest rate; (3) that the borrower's interest rate was higher than the rate at which the loan could have been made; (4) that CommonPoint would receive a "back end" fee upon sale of the borrower's loan; and (5) that the "document preparation fee" CommonPoint charged borrowers was unauthorized under Michigan law.[4] Movants' Brief at 8. Each of these allegations can be established by reviewing the three standardized documents or by the admissions of CommonPoint itself.

### 2. *Breach of Fiduciary Duty.*

Movants argue that CommonPoint breached its common law fiduciary and contractual duties under the Financial Services Agreements by: (1) failing to disclose that the interest rate received by the borrower was higher than the rate at which the loan could have been made; (2) failing

to disclose the "back end" fee that CommonPoint received when it sold the loan; (3) failing to disclose that no discount was given in exchange for the "discount fee" charged; (4) failing to disclose that the "document preparation fee" it collected was unauthorized under Michigan law; and (5) secretly taking compensation above that allowed for in the Financial Services Agreement. Movants' Brief at 8–9. Again, the validity of each of these allegations may be evaluated by examining the three standardized documents. Some of these allegations may also be supported by the admissions of CommonPoint's President, Michael D. Anderson. Movants' Brief at 9.

### 3. *Unjust Enrichment.*

Movants contend that CommonPoint's assessment of a "document preparation fee" violates established Michigan law, which prohibits non-attorneys from charging a fee for the preparation of legal documents. Movants assert that CommonPoint regularly charged potential class members a "document preparation fee" ranging from $125 to $350 per borrower. Movants' Brief at 9 and Exh. 5. In each instance, the Settlement Statement reveals whether a "document preparation fee" was assessed in connection with the loan. Movants' Brief, Exh. 5.

### V. DISCUSSION

■ "The bankruptcy rules permit the filing of a class proof of claim." *Reid v. White Motor Corp.*, 886 F.2d 1462, 1469 (6th Cir.1989), *cert. denied*, 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939 (1990). However, for a class proof of claim to proceed, the class claimants must timely

---

**4.** The Sixth Circuit Court of Appeals recently addressed the issue of "document preparation fee" disclosure under TILA in *Brannam v. Huntington Mortgage Co.*, 287 F.3d 601 (6th Cir.2002). In the present case, however, the

Movants' claims regarding CommonPoint's "document preparation fee" are based upon state law. Because the Movants have made no claims under TILA, *Brannam* appears inapposite to the court's current analysis.

request that the bankruptcy court apply the provisions of Bankruptcy Rules 9014 and 7023 and certify the class. *Reid,* 886 F.2d at 1471. The Movants in this case have done so.

■ This court must determine whether the requirements for obtaining class certification have been met. Throughout this inquiry, "[t]he individuals seeking class certification have the burden of proving that they are entitled to class certification." *Reid,* 886 F.2d at 1471. *See also Senter v. General Motors Corp.,* 532 F.2d 511, 522 (6th Cir.1976), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976).

### A. *Bankruptcy Rule 7023(a)—Prerequisites to a Class Action.*

■ Bankruptcy Rule 7023(a) sets forth four prerequisites that must be satisfied before a class action may be maintained: numerosity, commonality, typicality, and adequacy of representation. Each of the four prerequisites will be addressed in turn.

#### 1. *Numerosity.*

The party seeking class certification must establish that "the class is so numerous that joinder of all members is impracticable." FED.R.BANKR.P. 7023(a)(1). There are several factors to be considered in this determination.

■ One of the most important considerations is the "size of the class itself." 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1762 (2d ed.1987). There are no rigid numerical guidelines for determining impracticability of joinder based upon the size of the class. *See* 5 James Wm. Moore et al., *Moore's Federal Practice* ¶ 23.22, at 23–63 (3d ed.1997) (noting that potential classes of less than 21 members are generally insufficient to support class certification; classes with more than 40 members generally satisfy numerosity requirement; and classes with between 21 and 40 potential members receive varying treatment). "When class size reaches substantial proportions, however, the impracticability requirement is usually satisfied by the numbers alone." *In re American Medical Sys., Inc.,* 75 F.3d 1069, 1079 (6th Cir.1996) (finding that class with 15,000–120,000 potential claimants satisfied numerosity requirement) (citing 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions,* § 3.05, at 3–26 (3d ed.1992)). *See, e.g., Gilkey v. Central Clearing Co.,* 202 F.R.D. 515, 521 (E.D.Mich.2001) (numerosity requirement met in consumer fraud action under the MCPA and TILA where there were 4,383 potential class members); *Jones v. Allercare, Inc.,* 203 F.R.D. 290, 298 (N.D.Ohio 2001) (products liability class with over 5,000 potential members met numerosity requirement).

This potential class involves approximately 14,527 consumer loans made by CommonPoint between October, 1991 and October, 1997. Of these loans, the Movants estimate that approximately 9,617 individuals are eligible for class membership because they were charged a document preparation fee, 6,576 people are eligible because they were charged "loan discount" fees where no discount was given, and 8,953 people are eligible because CommonPoint received an undisclosed "back end" fee from their loans. Movants' Brief at 13; Motion at 3. Based upon the large numbers of potential class members, the court finds that joinder is impractical. The numerosity requirement is satisfied.

In addition to the size of the class, the court may also consider the geographic dispersion of potential class members, the ability and motivation of class members to institute individual actions, the difficulty of

identifying and locating potential class members and judicial economy in its assessment of whether joinder of all claims is impracticable. *See* 5 Moore et al., *supra,* ¶ 23.22, at 23–70–76.

The potential class members in this case are all residents of the state of Michigan. Although the court has little information about the individual claimants' respective geographic locations, the court reasonably infers that the claimants are dispersed throughout the state based upon the fact that CommonPoint maintained offices in several different locations. Further, although the computer database in this case facilitates the identification and location of potential class members, it would be very difficult for each class member to file an individual proof of claim, because they do not have access to CommonPoint's internally generated Closing Documents. The relatively small amount of any potential individual recovery and the lack of business sophistication among many class members, also suggest that potential class members are unable (or lack motivation) to file individual claims. The probable geographic dispersion of potential claimants, and their likely inability to institute individual actions provide further support for the conclusion that joinder of all claims is impracticable in this case.

### 2. *Commonality.*

 The party seeking class certification must also show that "there are questions of law or fact common to the class." FED.R.BANKR.P. 7023(a)(2). "The standard for commonality is not demanding." *Rugumbwa v. Betten Motor Sales,* 200 F.R.D. 358, 362 (W.D.Mich.2001) (TILA case). Indeed, "the commonality requirement is satisfied if the class shares even one common question of law or fact." 5 Moore et al., *supra,* ¶ 23.23, at 23–76. *See also Bittinger v. Tecumseh Prods. Co.,* 123 F.3d 877, 884 (6th Cir.1997) ("Rule 23(a) simply requires *a* common question of law or fact.") (emphasis in original). "Claims arising out of standard documents present a 'classic case for treatment as a class action.'" *Arenson v. Whitehall Convalescent & Nursing Home, Inc.,* 164 F.R.D. 659, 664 (N.D.Ill.1996). *See also Durrett v. John Deere Co.,* 150 F.R.D. 555, 558 (N.D.Tex.1993) (when class action arises from contracts that were virtually identical in each transaction "common questions of law and fact abound").

In this contested matter, the potential class members' claims against CommonPoint are based on common legal theories (i.e., violations of the MCPA, and the common law theories of breach of fiduciary duty and unjust enrichment). The validity of these theories can be determined by referring to the three standardized documents used by CommonPoint in each loan transaction. Therefore, the court easily finds that the commonality requirement has been met.

### 3. *Typicality.*

 The third prerequisite is closely related to the second, and requires the party seeking class certification to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED.R.BANKR.P. 7023(a)(3). "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re American Medical Sys., Inc.,* 75 F.3d 1069, 1082 (6th Cir.1996) (quoting 1 Newberg & Conte, *supra,* § 3.13, at 3–76). In consumer fraud cases, typicality will be found when "the class representative's claims arise from a contract similar to that of the putative class members." 5 Moore et al., *supra,* ¶ 23.24,

at 23–104. *See, e.g., Durrett v. John Deere Co.,* 150 F.R.D. 555, 558 (N.D.Tex.1993) (typicality requirement is met where claims of named plaintiffs and putative class members arise from a standardized contract).

In this contested matter, the claims of the class representatives are nearly identical to the claims of the other putative class members because they arise from CommonPoint's routine loan practices, as shown by the three standardized loan documents that were used by CommonPoint in almost every loan transaction. The class representatives' claims are also based upon the same three legal theories as the claims of the other potential class members. Therefore, the court readily finds that the claims of the class representatives are typical of the class as a whole.

#### 4. *Adequacy of Representation.*

Finally, the party requesting class certification must prove that "the representative parties will fairly and adequately protect the interests of the class." FED. R.BANKR.P. 7023(a)(4). The Sixth Circuit has established a two-prong test with respect to the adequacy of representation requirement. First, "[t]he representative must have common interests with unnamed members of the class." *Senter,* 532 F.2d at 525. Second, "it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Id.*

Adequacy of representation has not been contested. The named plaintiffs have no interests that are adverse to the class in general, and, to date, the named class representatives have vigorously prosecuted this action over the course of several years, in both the state and federal courts. The named class members are also represented by competent attorneys, who appear to be experienced in class action and consumer litigation, as well as bankruptcy law. Therefore, the court finds that the class representatives will fairly and adequately protect the interests of the class.

#### B. *Bankruptcy Rule 7023(b)(3)—Additional Requirements for Class Certification.*

In addition to the four factors required by Rule 7023(a), the court must find "that the questions of law or fact common to the members of the class *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for the fair and efficient adjudication of the controversy" before a matter can properly be certified as a class action. FED.R.BANKR.P. 7023(b)(3) (emphasis added).

#### 1. *Predominance.*

"No precise test governs the determination of whether common questions of law or fact predominate .... [i]nstead, the Rule requires a pragmatic assessment of the entire action and of all the issues involved." 5 Moore et al., *supra,* ¶ 23.46, at 23–206. Furthermore, "the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Sterling v. Velsicol Chemical Corp.,* 855 F.2d 1188, 1197 (6th Cir.1988). Indeed, common questions of law or fact are particularly likely to predominate in cases which derive from form documents and standardized procedures. *See, e.g., Mayo v. Sears, Roebuck & Co.,* 148 F.R.D. 576, 583 (S.D.Ohio 1993) (common questions predominate where plaintiffs' allegations hinge on the use of standardized forms and routine procedures).

In the present class claim, the allegations of each potential claimant are

based upon the same three legal theories. The issue of liability may be determined by examining the three standard documents used by CommonPoint in nearly all of their loan transactions. It is probable that the only individual questions will relate to the amount of damages suffered by each borrower. However, the amount of damages owed to each individual borrower appears to be easily calculable. The separate damage issues are not enough to outweigh the common questions of fact and law. The predominance requirement has been satisfied.

### 2. *Superiority.*

In determining whether a class action is the superior method of adjudicating a particular claim, the court must exercise its discretion and carefully "consider the benefits and costs of class litigation." *In re American Reserve Corp.*, 840 F.2d 487, 492 (7th Cir.1988). The court recognizes that the "superiority" of possible utilization of a class proof of claim is largely a matter of perspective. From the trustee's viewpoint, the certification of a class proof of claim in this case seems "burdensome and unnecessary." Tr. at 28. Yet, from the perspective of the potential class members, many of whom would be unlikely or unable to pursue claims against CommonPoint absent class certification, the certification of a class proof of claim in this case is unquestionably the superior—and possibly the only—method for adjudicating their claims.

At the very least, certifying the class would not be an "inferior" method for adjudicating Movants' claims, so long as proper procedures, uniquely tailored to this particular class action dispute, are utilized. Further, the court believes that the interests of justice that would be served by certification of a class in this bankruptcy case far outweigh any manageable administrative concerns that may arise as a result of class certification. Consequently, the court finds that certification of a class proof of claim is the superior method for adjudicating the Movants' claims in this case.

### C. *Class Certification in the Bankruptcy Context.*

As an additional aspect of its general inquiry into "superiority," the court "must assess whether the benefits that generally support class certification in civil litigation are realizable in the bankruptcy case." *In re Mortgage & Realty Trust*, 125 B.R. 575, 580 (Bankr.C.D.Cal. 1991). These benefits usually include "efficiency of a class proof of claim, compensation to the injured parties, and deterrence of future wrongdoing by the debtor." *Id.* See also *In re Woodward & Lothrop Holdings, Inc.*, 205 B.R. 365, 376 (Bankr. S.D.N.Y.1997).

### 1. *Efficiency of the Class Proof of Claim.*

The procedural benefit of the class action—that is, the ability to "concentrate litigation in a single forum" where it may be resolved more efficiently than a series of suits—is not generally applicable in the bankruptcy setting. *In re American Reserve Corp.*, 840 F.2d at 489. "The bankruptcy forum, as a mandatory collective proceeding, serves this purpose without the overlay of the class action." *Id.* To the contrary, class actions may result in "systemic costs" that "should not be borne lightly." *Id.* at 490 ("class actions are a headache for judges .... [they] consume judicial time, putting off adjudication for other deserving litigants [and] they impose steep costs on defendants, even those in the right").

However, procedures may be utilized that will be as efficient as those that would

be required if each claimant were to file an individual proof of claim. If such procedures are mandated, the utilization of a class proof of claim shall be workable and efficient in this bankruptcy case.

### 2. *Compensation of Injured Parties.*

Outside of bankruptcy, a major benefit of the class action device is that it "permits the aggregation and litigation of many small claims that otherwise would lie dormant," thus providing potential "compensation that cannot be achieved in any other way." *In re American Reserve Corp.*, 840 F.2d at 489. This benefit is seldom necessary in a bankruptcy case because "the bankruptcy creditor can, with a minimum of effort, file a proof of claim and participate in distributions." *In re Woodward & Lothrop Holdings, Inc.*, 205 B.R. at 376.

Yet, even in bankruptcy, the class action mechanism may be useful because "holders of contingent claims ... may not recognize their entitlement unless some champion appears." *In re American Reserve Corp.*, 840 F.2d at 489. For these potential claimants, "[e]ven though there is no fee to file claims in bankruptcy, the opportunity costs of the time needed to investigate and decide whether to file may be substantial." *Id. See In re United Companies Fin. Corp.*, 276 B.R. 368 (Bankr.D.Del.2002) (class action is superior method for adjudicating claims where many class members are unaware of their rights under state law and where small amount of any potential recovery renders prosecution of individual claims cost-prohibitive).

Such considerations are particularly important in this case because, without access to the Closing Document, potential class members are unable to determine whether they hold a valid claim against CommonPoint. Each potential class member would have to consult an attorney or, at the very least, contact the trustee to request a copy of the document (assuming a claimant would know of the existence and importance of the Closing Document). Each individual would have to compare the Closing Document with their Financial Services Agreement and Settlement Statement to determine whether they had a possible claim against CommonPoint.

The burden of conducting this type of individual investigation would be onerous for the claimants to bear, especially considering the small amount of each potential claim, the even smaller amount of any potential recovery, and the apparent lack of business sophistication of many of the consumer claimants. If the class proof of claim process is not utilized, justice may be denied.

■■■ The court must also consider the amount of compensation that may become available to class members in its analysis. Generally, "the prospect of compensation must be significant to justify the certification of a class claim." *In re Woodward & Lothrop Holdings, Inc.*, 205 B.R. at 376. This is because "[s]uits for very small stakes may hold out little prospect for compensation or deterrence." *In re American Reserve Corp.*, 840 F.2d at 492. *See also In re Woodward & Lothrop Holdings, Inc.*, 205 B.R. at 376 (where class representative claimed damages of only $922.15, the stakes were not substantial enough to justify certification of a class claim).

The class proof of claim filed in this case totals $27,368,062.99. That is a substantial amount. On the other hand, the average claim of each individual claimant is only approximately $2,000. Because there are many other creditors, the amount that each class claimant might actually be paid would likely be significantly less than $2,000. Yet, *any* potential recovery shall

be meaningful to individual consumer claimants.

### 3. *Deterrence of Future Wrongdoing.*

The court recognizes that "[d]eterrence is less likely in bankruptcy." *In re American Reserve Corp.*, 840 F.2d at 490. This is particularly true in chapter 7 cases such as the present one, where certification of the class claim will have no conceivable effect on the debtor's business because it will not be operating in the future. *In re Woodward & Lothrop Holdings, Inc.*, 205 B.R. at 376 ("the class claim will not deter an insolvent, non-operating debtor's management or shareholders, or induce them to police future conduct . . . . [where] the managers have moved on to other jobs [and] the debtor has closed its doors, . . . the prosecution of the class action will probably not affect how they act in the future").

It is possible, however, that "the award of damages against a bankrupt will have exemplary effects for firms that are not yet bankrupt but may become so." *In re American Reserve Corp.*, 840 F.2d at 491. Consequently, although it is somewhat speculative and not a major factor or consideration, if this court ultimately determines that CommonPoint is liable to the class, that finding may conceivably deter other lenders from engaging in similar procedures and activities.

### 4. *Justice for Class Claimants.*

The court must consider the interests of the potential class members themselves.

The allegations in this case suggest that CommonPoint may have wronged several of its unsuspecting consumer customers. Without access to the Closing Document, which was generated internally by CommonPoint employees, many of these borrowers are likely unaware of their potential claims against CommonPoint. Even if some borrowers suspect that they may have a claim against CommonPoint, it is probable that they will lack the resources and motivation necessary to pursue their claim in the normal bankruptcy setting. Thus, absent class certification in this case, most of these consumers will have no other meaningful opportunity to pursue their claims against CommonPoint. Such a result would be unfair and unacceptable to this court.

Because the procedural requirements of Bankruptcy Rule 7023 have been satisfied and because use of the class proof of claim will produce significant benefits, the court finds that certification of Movants' class proof of claim is entirely appropriate in this case, conditioned upon the procedural safeguards addressed below.

### D. *Procedure for Class Certification in this Case.*

 Litigation of the class proof of claim will proceed in accordance with the following procedures. Pursuant to Bankruptcy Rule 7042(b), which authorizes the court to order separate trials of any claims or issues, the court has determined that bifurcation of issues is appropriate.[5]

---

**5.** Rule 7042(b) gives the judge "broad discretion to use the separate trial device 'in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy.'" Susan E. Abitanta, Comment, *Bifurcation of Liability and Damages in Rule 23(b)(3) Class Actions: History, Policy, Problems and a Solution,* 36 Sw.L.J. 743, 744 (1982) (discussing

FED.R.CIV.P. 42(b)). Bifurcation can be particularly useful in the litigation of complex cases where liability and damage issues are easily separable. *See Id.* at 745. *See, e.g., Surf Walk Condominium Ass'n v. Wildman,* 84 B.R. 511, 514 (N.D.Ill.1988) (upholding bankruptcy court's bifurcation of trial into a hearing of liability followed by a hearing on damages and explaining that "[t]he decision

First, the court will determine the issues related to CommonPoint's potential liability to the class. At this stage, notice of the pending action will be sent to all potential class members (as they have been identified in the Movants' computer database). This notice will provide potential class members with the opportunity to opt-out of the class should they choose to do so. The court will then conduct a hearing to resolve the common issues involving CommonPoint's potential liability to all members of the class who have not exercised their opt-out right.

 Only if liability is established, the court will determine the proper amount of damages in the second stage of the bifurcated proceeding. A second notice will be sent to class members, notifying them of the finding of liability. The notice will also instruct class members to file a proof of claim stating the amount of damages they believe they are entitled to based upon the court's findings.[6] After the proofs of claim are filed, the trustee, or other interested parties with standing, will have the opportunity to object to each individual damage claim. If no objections are lodged, the damages asserted in each proof of claim will be allowed. 11 U.S.C. § 501. If an objection is filed to any proof of claim, a hearing on contested damage claims will take place and appropriate damages will be calculated and allowed.[7]

## VI. CONCLUSION

The Movants have satisfied the requirements of Bankruptcy Rule 7023 and the court finds that certification of the class proof of claim is appropriate in this contested matter. A separate order will be entered accordingly.

whether to bifurcate a trial is necessarily committed to the discretion of the bankruptcy judge"). ·

6. Although the court notes that "[c]lass members should not ... be required to submit proofs of claim as a condition of membership in the class," they may be "called on to provide the court with information regarding their individual claims." *Manual for Complex Litigation* § 30.232 (3d ed.1995). This type of "opt-in" requirement is particularly "appropriate in connection with preparation for the second stage of a bifurcated trial (with adequate time allowed for discovery) or the determination of entitlement to individual relief under a judgment or settlement." *Id. See, e.g., Ziemack v. Centel Corp.,* 164 F.R.D. 477 (N.D.Ill.1995) (the court refused to require potential class members to submit proof of claim as a condition of class membership); *Byrnes v. IDS Realty Trust,* 70 F.R.D. 608 (D.Minn.1976) (the court refused to require potential class claimants to submit proof of claim form prior to class certification); *B & B Inv. Club v. Kleinert's Inc.,* 62 F.R.D. 140 (E.D.Pa.1974) (the court would not require

submission of claims until liability or a recovery fund was established) (all of these actions involved allegations of securities fraud).

7. These procedures are tailored to be both consonant with class action litigation procedures and faithful to the bankruptcy claims allowance process. The overall goal is to achieve justice among all competing collective interests. All class members will be included, unless one or more opt-out, during the liability phase of the trial. Assuming liability exists, each class member will be notified to complete an individual amended claim for damages with a claims bar date established by the court. Only timely filed claims will be entitled to prima facie treatment under Fed.R.Bankr.P. 3002(f). Under these procedures, class members will be treated similarly with other claimants, e.g. open account trade creditors. Any conflict between class action principles and bankruptcy claim procedures will be harmonized, and a just, speedy and inexpensive determination of the parties' rights is more likely to occur. Fed.R.Bankr.P. 1001.